## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THUY NGUYEN, derivatively on behalf of WALMART, INC., <br><br>     Plaintiff, <br><br>     v. <br><br> C. DOUGLAS McMILLON, M. BRETT BIGGS, JR., CESAR CONDE, TIMOTHY P. FLYNN, SARAH J. FRIAR, CARLA A. HARRIS, THOMAS W. HORTON, MARISSA A. MAYER, GREGORY B. PENNER, STEVEN S. REINEMUND, S. ROBSON WALTON, and STEUART L. WALTON, <br><br><br>     Defendants, <br><br>     and <br><br> WALMART, INC., <br><br>     Nominal Defendant. | **C.A. No.** <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff Thuy Nguyen ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Walmart, Inc. (" Walmart" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants C. Douglas McMillon, M. Brett Biggs, Cesar Conde, Timothy P. Flynn, Sarah J. Friar, Carla A. Harris, Thomas W. Horton, Marissa A. Mayer, Gregory B. Penner, Steven S. Reinemund, S. Robson Walton, and Steuart L. Walton (collectively, the "Individual Defendants," together with Walmart, the "Defendants") for

breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Walmart, unjust enrichment, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding  Walmart, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Walmart's controlling shareholders, directors, and officers from March 30, 2016 to December 22, 2020 (the "Relevant Period").

2.     Walmart is an Arkansas-based company that specializes in providing merchandise to consumers, through its physical stores and over the internet, at very low prices. It operates retail stores under both the Walmart and Sam's Club names.

3.     Among the goods Walmart sells are prescription drugs, which it dispenses at almost 5,000 pharmacy locations in the United States. At issue, are the false and misleading statements the Company made with respect to its pharmacy and drug distribution business.

4.     Walmart's Board of Directors (the "Board"), throughout the Relevant Period, were aware that the Company had insufficient controls in place over its pharmacy and drug distribution operations given that in March 2011 the Company entered into a memorandum of agreement (the "MOA") with the United States Drug Enforcement Agency (the "DEA") requiring the Company to put in place requisite controls over their opioid distribution pursuant to the Comprehensive Drug Abuse and Prevention Act of 1970, 21 U.S.C. §§ 801 *et seq.* (also called the "Controlled Substances Act" or the "CSA"). These controls were never put into place and illegal sales of opioids continued in large numbers.

5.     Despite the Individual Defendants' knowledge and the MOA, Walmart continued selling ever increasing amounts of opioids, and engaged in practices to obfuscate the nature and quantity of these sales. Throughout the Relevant Period, the Individual Defendants made and/or caused the Company to make materially false and misleading statements about this practice which failed to disclose its existence, the risk of enforcement action which it created, and that it was inflating the Company's pharmacy revenues.

6.     The truth finally emerged on December 22, 2020, while markets were still open, when the Department of Justice (the "DOJ"), announced that it was suing Walmart for "hundreds of thousands of violations of the Controlled Substances Act[.]" and that it was seeking penalties "which could total in the billions of dollars, and injunctive relief."

7.     On this news, the price of the Company's common stock fell from $145.97 per share at close the day before, December 21, 2020, to end that day, December 22, 2020, at $144.20 per share.  The slide continued the next day, December 23, 2020, with the Company closing at $143.22. Thus, over the course of those two days, the Company's common stock fell $2.75 per share, or about 1.9%.

8.      The Individual Defendants, during the Relevant Period, breached their fiduciary duties by making, and/or causing the Company to make, materially false and misleading statements and omissions which failed to disclose, *inter alia*, that: (1) the Company was filling prescriptions from physicians known to be over-prescribers, also called "pill mills;" (2) the Company filled prescriptions numbering in the thousands which had clear signs of illegality, including prescriptions of drugs which were extremely dangerous when used together; (3) Walmart's managers actively encouraged Walmart's pharmacists to abdicate their legal responsibilities and to fill as many prescription drug orders as they could, regardless of their validity; (4) Walmart's pharmacy revenue was artificially inflated because of the amount of prescriptions they were illegally filling; (5) Walmart did not maintain an adequate suspicious order monitoring program; (6) due to this, Walmart's distribution network failed to detect and report thousands of suspicious orders; (7) by illegally filling prescriptions and shipping suspicious orders in such great quantities, the Company was likely to, and did, become subject to enforcement action; and (8) the Company failed to maintain adequate internal controls. As a result of the foregoing, the statements at issue concerning the Company's business, operations, and prospects were materially false and misleading at all relevant times.

9.      Moreover, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentation, while one of them engaged in insider sales for proceeds in excess of $995 million.

10.     Approximately 6.2 million shares of Company common stock were repurchased at inflated prices between November 1, 2020 and December 31, 2020[1] at a cost of approximately $906.4 million.

11.     As the Company's stock was only worth $143.22, the price at the close of trading on December 23, 2020, the Company overpaid by approximately $23.9 million in total.

12.     The Individual Defendants also violated section 14(a) of the Exchange Act by causing the Company to issue a proxy statement, filed with the SEC on Schedule 14A on April 23, 2020 (the "2020 Proxy Statement"), which contained false and misleading statements and omissions of material fact.

13.     In light of the Individual Defendants' misconduct, which has subjected the Company to a federal securities class action pending in this Court which also names the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") as defendants (the "Securities Class Action"); the need to undertake internal investigations; the need to implement adequate internal controls; the losses from the waste of corporate assets; the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein; the Company will have to expend many millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with

---

[1] Upon information and belief, some of the repurchases reported between December 1 and December 31 were made while the price of the Company's shares was artificially inflated due to the false and misleading statements discussed herein.

each other, and their not being disinterested and/or independent directors, a majority of Walmart's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

16.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because Walmart is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

20.     Plaintiff is a current shareholder of Walmart.  Plaintiff has continuously held Walmart common stock at all relevant times.

**Nominal Defendant Walmart**

21.     Walmart is a Delaware corporation with its principal executive offices at 702 S.W. 8th Street, Bentonville, Arkansas 72716.  Walmart's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "WMT."

**Defendant McMillon**

22.     Defendant C. Douglas McMillon ("McMillon") has been the Company's President and CEO since 2014 and a Company director since 2013. In addition, he is the Chair of the Executive Committee and has worked at Walmart for almost 30 years, including a variety of leadership positions. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant McMillon beneficially owned 1,808,755 shares of Company common stock. Given that the price per share of the Company's common stock at close on April 9, 2020 was $121.80, Defendant McMillon owned approximately $220.3 million worth of Company common stock as of that date.

23.     For the fiscal year ended January 31, 2020 ("Fiscal Year 2020"), Defendant McMillon received $22,105,350 in total compensation, including $1,276,892 in salary, $15,709,953 in stock awards, $3,516,817 in non-equity incentive plan compensation, $1,191,597 in change in pension value and nonqualified deferred compensation earning, and $410,091 in all other compensation. For the fiscal year ended January 31, 2019 ("Fiscal Year 2019"), he received $23,618,233 in total compensation, including $1,276,892 in salary, $15,592,404 in stock awards, $5,088,000 in non-equity incentive plan compensation, $1,090,984 in change in pension value and nonqualified deferred compensation earnings, and $569,953 in all other compensation. For the fiscal year ended January 31, 2018 ("Fiscal Year 2018"), he received $22,791,276 in total compensation, including $1,276,982 in salary, $15,692,464 in stock awards, $4,736,750 in non-equity incentive plan compensation, $611,315 in change in pension value and nonqualified deferred compensation earnings, and $473,765 in all other compensation. For the fiscal year ended January 31, 2017 ("Fiscal Year 2017"), he received $22,352,143 in total compensation, including

$1,278,989 in salary, $15,224,706 in stock awards, $4,851,561 in non-equity incentive plan compensation, $510,155 in change in pension value and nonqualified deferred compensation earnings, and $486,732 in all other compensation.

24.     The 2020 Proxy Statement said the following of Defendant McMillon, in relevant part:

> Mr. McMillon has served as a member of the executive committee of the Business Roundtable since 2014, and he became the chairman of the Business Roundtable in January 2020. He also serves as a member of the boards of directors of a number of organizations, including The Consumer Goods Forum, The US-China Business Council, and Crystal Bridges Museum of American Art.

**Defendant Biggs**

25.     Defendant Biggs has been an Executive Vice President and the CFO of the Company since January 2016. According to the 2020 Proxy Statement, as of April 9, 2020 Defendant Biggs beneficially owned 302,960 shares of Company common stock. Given that the price per share of the Company's common stock was $121.80 on April 9, 2020, Defendant Biggs owned approximately $36.9 million worth of Company common stock as of that date.

26.     For Fiscal Year 2020, Defendant Biggs received $8,798,491 in total compensation, including $8,798,491 in total compensation, including $915,358 in salary, $5,752,910 in stock awards, $1,575,710 in non-equity incentive plan compensation, $292,100 in change in pension value and nonqualified deferred compensation earnings, and $262,413 in all other compensation. For Fiscal Year 2019, Defendant Biggs earned $9,420,414 in total compensation, including $892,948 in total compensation, $5,710,085 in stock awards, $2,223,926 in non-equity incentive plan compensation, $269,005 in change in pension value and nonqualified deferred compensation earnings, and $324,450 in all other compensation. For Fiscal Year 2018, Defendant Biggs received $7,593,171 in total compensation, including $871,087 in salary, $4,237,993 in stock awards,

$2,027,759 in non-equity incentive plan compensation, $140,199 in change in pension value and nonqualified deferred compensation earnings, and $316,133 in all other compensation. For Fiscal Year 2017, he received $6,409,160 in total compensation, including $854,670 in salary, $3,176,574 in stock awards, $2,026,251 in non-equity incentive plan compensation, $101,880 in change in pension value and nonqualified deferred compensation earnings, and $249,785 in all other compensation.

27.     The Company's annual report for the fiscal year ended January 31, 2021, filed on Form 10-K with the SEC on March 19, 2021 (the "2021 10-K"), stated the following regarding Defendant Biggs:

> Executive Vice President and Chief Financial Officer, effective January 2016. From January 2014 to December 2015, he served as Executive Vice President and Chief Financial Officer of Walmart International.

**Defendant Conde**

28.     Defendant Cesar Conde ("Conde") has served on the Company's Board since February 2019 and is a member of the Audit Committee and the Technology and eCommerce Committee. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Conde beneficially owned 2,814 shares of Company common stock. Given that the price per share on April 9, 2020 was $121.80, Defendant Conde owned approximately $343,000 worth of Company common stock as of that date.

29.     For Fiscal Year 2020, Defendant Conde received $317,948 in total compensation, including $89,739 in fees earned or paid in cash and $228,209 in stock awards.

30.     The Company's 2020 Proxy Statement stated the following about Defendant Conde, in relevant part:

> Mr. Conde has served on the board of directors of PepsiCo, Inc. since March 2016, and from August 2014 to April 2019 he served on the board of directors of Owens Corning. He also is a Trustee of the Aspen Institute and the Paley Center for Media,

as well as a Full Member at the Council on Foreign Relations, and he has served as a Young Global Leader for the World Economic Forum. Mr. Conde holds a B.A. with honors from Harvard University and an M.B.A. from the Wharton School at the University of Pennsylvania.

**Defendant Flynn**

31.     Defendant Timothy J. Flynn ("Flynn") has served as a Company director since 2012. He also serves as Chair of the Audit Committee and as a member of the Technology and eCommerce Committee. According to the 2020 Proxy Statemen, as of April 9, 2020, Defendant Flynn beneficially owned 46,757 shares of Company common stock. Given that the price per share as of that date was $121.80, Defendant Flynn owned approximately $5.7 million worth of Company common stock.

32.     For Fiscal Year 2020, Defendant Flynn received $300,630 in total compensation, including $124,946 in fees earned or paid in cash, $175,008 in stock awards, and $676 in all other compensation. For Fiscal Year 2019, he received $387,143 in total compensation, including $210,926 in fees earned or paid in cash, $174,970 in stock awards, and $1,247 in all other compensation. For Fiscal Year 2018, he received $381,729 in total compensation, including $205,070 in fees earned or paid in cash, $175,005 in stock awards, and $1,654 in all other compensation. For Fiscal Year 2017, he received $384,364 in total compensation, including $176,500 in fees earned or paid in cash, $174,978 in stock awards, and $32,886 in all other compensation.

33.     The 2020 Proxy Statement said the following about Defendant Flynn, in relevant part:

> Mr. Flynn joined the boards of Alcoa Corporation in November 2016 and UnitedHealth Group Incorporated in January 2017. He also has served as a member of the board of directors of JPMorgan Chase & Co. since 2012. He previously served as a member of the board of directors of The Chubb Corporation from September 2013 until its acquisition in January 2016. He also previously served as a trustee of the Financial Accounting Standards Board, a member of the World

Economic Forum's International Business Council, and a director of the International Integrated Reporting Council. Mr. Flynn graduated from the University of St. Thomas, St. Paul, Minnesota and is a member of the school's board of trustees.

**Defendant Friar**

34.     Defendant Sarah J. Friar ("Friar") has served on the Company's Board since February 2018. She is Chair of the Strategic Planning and Finance Committee and a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant Friar beneficially owned 7,236 shares of Company common stock. Given that the price of the Company's common stock was $121.80 as of that date, Defendant Friar owned approximately $881,000 worth of Company common stock.

35.     For Fiscal Year 2020, Defendant Friar received $293,026 in total compensation, including $118,018 in fees earned or paid in cash and $175,008 in stock awards. For Fiscal Year 2019, she received $361,673 in total compensation, including $131,575 in fees earned or paid in cash and $230,098 in stock awards.

36.     The Company's 2020 Proxy Statement said the following about Defendant Friar, in relevant part:

> Ms. Friar has served as a director of Slack Technologies, Inc., the leading channel-based messaging platform, since March 2017. She also previously served on the board of directors of New Relic, Inc., a software analytics company, from December 2013 until April 2018, and Model N, Inc. from September 2012 until May 2015. Ms. Friar is the co-founder of Ladies Who Launch, a non-profit organization focused on empowering female entrepreneurs. Ms. Friar is a Fellow of the inaugural class of the Finance Leaders Fellowship Program and a member of the Aspen Global Leadership Network. Ms. Friar graduated from the University of Oxford with a Master of Engineering in Metallurgy, Economics, and Management and also from Stanford Graduate School of Business with an M.B.A.

**Defendant Harris**

37.     Defendant Carla A. Harris ("Harris") has served as a Company director since 2017. She is also a member of the Compensation and Management Development Committee, the

Nominating and Governance Committee, and the Strategic Planning and Finance Committee. According to the 2020 Proxy Statement, as of April 9, 2020 she beneficially owned 7,349 shares of Company common stock. Given that the price per share as of that date was $121.80, Defendant Harris owned approximately $895,000 of Company common stock.

38.     For Fiscal Year 2020, she received $275,977 in total compensation, including $99,909 in fees earned or paid in cash, $175,008 in stock awards, and $1,060 in all other compensation. For Fiscal Year 2019, she received $270,740 in total compensation, including $95,770 in fees earned or paid in cash and $174,970 in stock awards. For Fiscal Year 2018, she received $227,157 in total compensation, including $52,152 in fees earned or paid in cash and $175,005 in stock awards.

39.     The 2020 Proxy Statement said the following about Defendant Harris, in relevant part:

> In her current roles at Morgan Stanley, Ms. Harris is responsible for increasing client connectivity and penetration to enhance revenue generation across the firm. Her prior experience with Morgan Stanley includes investment banking, equity capital markets, equity private placements, and initial public offerings in a number of industries such as technology, media, retail, telecommunications, transportation, healthcare, and biotechnology. In August 2013, President Obama appointed Ms. Harris to serve as Chair of the National Women's Business Council. She currently serves on the boards of several non-profit organizations including St. Vincent's and the Morgan Stanley Foundation, as well as a member of the Board of Overseers for Harvard University. Ms. Harris holds a B.A. magna cum laude from Harvard University and also holds an M.B.A. from Harvard Business School.

**Defendant Horton**

40.     Defendant Thomas W. Horton ("Horton") has served as a Company director since 2014. In addition, he is Lead Independent Director and serves as Chair of the Nominating and Governance Committee and as a member of the Audit Committee, the Executive Committee, and the Strategic Planning and Finance Committee. According to the 2020 Proxy Statement, Defendant

Horton beneficially owned 11,934 shares of Company common stock as of April 9, 2020. Given that the price per share of Company common stock was $121.80 as of that date, Defendant Horton owned approximately $1.5 million worth of Company common stock.

41.     For Fiscal Year 2020 Defendant Horton received $333,146 in total compensation, including $157,11 in fees earned or paid in cash, $175,008 in stock awards, and $1,027 in all other compensation. For Fiscal Year 2019, he received $369,037 in total compensation, including $193,214 in fees earned or paid in cash, $174,970 in stock awards, and $853 in all other compensation. For Fiscal Year 2018, he received $322,513 in total compensation, including $146,593 in fees earned or paid in cash, $175,005 in stock awards, and $915 in all other compensation. For Fiscal Year 2017, he received $317,561 in total compensation, including $139,000 in fees earned or paid in cash, $174,978 in stock awards, and $3,583 in all other compensation.

42.     The 2020 Proxy Statement said the following about Defendant Horton, in relevant part:

> In August 2019, Mr. Horton was appointed to the board of directors of EnLink Midstream, LLC, a portfolio company of Global Infrastructure Partners that provides midstream energy services. He also has served on the board of directors of General Electric Company since April 2018, where he has served as Lead Director since October 2018. From 2008 to March 2019, Mr. Horton served on the board of directors of QUALCOMM Incorporated. Mr. Horton also serves on the executive board of the Cox School of Business at Southern Methodist University.

**Defendant Mayer**

43.     Defendant Marissa A. Mayer ("Mayer") has served as a Company director since 2012. She also serves as a member on both the Compensation and Management Development Committee and the Technology and eCommittee. According to the 2020 Proxy Statement, as of April 9, 2020 Defendant Mayer beneficially owned 29,717 shares of Company

common stock. Given that the price per share of company common stock was $121.80 as of that date, Defendant Mayer owned approximately $3.6 million worth of Company common stock.

44.     For Fiscal Year 2020, Defendant Mayer received $274,944 in total compensation, including $99,936 in fees earned or paid in cash and $175,008 in stock awards. For Fiscal Year 2019, she received $270,806 in total compensation, including $95,836 in fees earned or paid in cash and $174,970 in stock awards. For Fiscal Year 2018, she received $267,200 in total compensation, including $89,985 in fees earned or paid in cash, $175,005 in stock awards, and $2,210 in all other compensation. For Fiscal Year 2017, she received $266,808 in total compensation, including $90,000 in fees earned or paid in cash, $174,978 in stock awards, and $1,830 in all other compensation.

45.     The 2020 Proxy Statement said the following about Defendant Mayer, in relevant part:

> In July 2019, Ms. Mayer joined the board of directors of Go Forward, Inc., a company that combines virtual and in-person primary care practice. Since April 2019, Ms. Mayer has served on the board of directors of Maisonette, LLC, an online company focused on providing customized shopping experiences in children's luxury brands and boutique clothing, accessory, and home decor items. From March 2013 until October 2016, Ms. Mayer served on the board of directors for AliphCom, which operated as Jawbone. She also serves on the boards of the San Francisco Museum of Modern Art and the San Francisco Ballet, and she previously served on the foundation board for the Forum of Young Global Leaders at the World Economic Forum from 2013 to 2019. Ms. Mayer holds a bachelor's degree in symbolic systems and a master's degree in computer science from Stanford University.

**Defendant Penner**

46.     Defendant Gregory B. Penner ("Penner") has served as a Company director since 2008 and as Chairman of the Board since 2015. He also serves on the Executive Committee. He has worked at Walmart in numerous capacities since 2001. In addition, he is the son-in-law of Defendant S. Robson Walton ("R. Walton").  According to the 2020 Proxy Statement, as of April

9, 2020 Defendant Penner beneficially owned 544,955 shares of Company common stock. Given that the price of Company common stock was $121.80 as of that date, Defendant Penner owned approximately $66.4 million worth of Company common stock.

47.     For Fiscal Year 2020, Defendant Penner received $500,058 in total compensation, including $212,590 in fees earned or paid in cash and $287,468 in stock awards. For Fiscal Year 2019, he received $490,786 in total compensation, including $202,264 in fees earned or paid in cash and $287,522 in stock awards. For Fiscal Year 2018, he received $465,043 in total compensation, including $190,036 in fees earned or paid in cash and $275,007 in stock awards. For Fiscal Year 2017, he received $468,976 in total compensation, including $194,000 in fees earned or paid in cash and $274,976 in stock awards.

48.     The 2020 Proxy Statement stated the following about Defendant Penner, in relevant part:

> Since August 2018, Mr. Penner has served on the board of directors of a mobile premium video subscription platform that operates as Quibi. Mr. Penner also previously served as a member of the board of directors of Baidu, Inc. from May 2004 until December 2017, and he also previously served on the board of Hyatt Hotels Corporation from October 2007 to September 2014.

**Defendant Reinemund**

49.     Defendant Steven S. Reinemund ("Reinemund") has served as a Company director since 2010. In addition, he serves as the Chair of the Compensation and Management Development Committee and as a member on both the Nominating and Governance Committee and the Technology and eCommerce Committee. According to the 2020 Proxy Statement, as of April 9, 2020 Defendant Reinemund beneficially owned 25,578 shares of Company common stock. Given that the price of Company common stock as of that date was $121.80 per share, Defendant Reinemund owned approximately $3.1 million worth.

50.    For Fiscal Year 2020, Defendant Reinemund received $302,204 in total compensation, including $125,000 in fees earned or paid in cash, $175,008 in stock awards, and $2,196 in all other compensation. For Fiscal Year 2019, he received $296,632 in total compensation, including $120,879 in fees earned or paid in cash, $174,970 in stock awards, and $783 in all other compensation. For Fiscal Year 2018, he received $287,958 in total compensation, including $112,953 in fees earned or paid in cash and $175,005 in stock awards. For Fiscal Year 2017, he received $289,787 in total compensation, including $114,000 in fees earned or paid in cash, $174,978 in stock awards, and $809 in all other compensation.

51.    The 2020 Proxy Statemen said the following about Defendant Reinemund, in relevant part:

> Mr. Reinemund served on the board of directors of GS Acquisition Holdings Corp. from June 2018 until February 2020, until the completion of business combination transactions that resulted in Vertiv Holdings Co., where Mr. Reinemund continues to serve on the board of directors. Mr. Reinemund has served as a director of each of Exxon Mobil Corporation and Marriott International, Inc. since 2007. Mr. Reinemund has also been on the board of directors of Chick-fil-A, Inc. since June 2015. He previously served as a director of American Express Company from 2007 to 2015 and Johnson & Johnson from 2003 to 2008. Mr. Reinemund is a member of the boards of trustees of The Cooper Institute and the U.S. Naval Academy Foundation.

**Defendant R. Walton**

52.    Defendant R. Walton has served as a Company director since 1978. He also serves on the Executive Committee and the Strategic Planning and Finance Committee. He has worked at the Company since 1968 including as Chairman of the Board from 1992 to 2015. Prior to being Chairman, he served in a variety of executive capacities. In addition, he is the uncle of Defendant S. Walton, and the father-in-law of Defendant Penner. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant R. Walton beneficially owned 1,422,663,514 shares of Company common stock, representing 50.21% of the outstanding shares, making him a controlling

shareholder. Given that the price of the Company's common stock was $121.80 per share as of that date, Defendant R. Walton owned approximately $173.3 billion worth of Company common stock.

53.     For Fiscal Year 2020, Defendant R. Walton received $275,008 in total compensation, including $100,000 in fees earned or paid in cash and $175,008 in stock awards. For Fiscal Year 2019, he received $272,393 in total compensation, including $95,879 in fees earned or paid in cash, $174,970 in stock awards, and $1,544 in all other compensation. For Fiscal Year 2018, he received $265,005 in total compensation, including $90,000 in fees earned or paid in cash and $175,005 in stock awards. For Fiscal Year 2017, he received $268,978 in total compensation, including 94,000 in fees earned or paid in cash and $174,978 in stock awards.

54.     During the Relevant Period, when Company's stock price was artificially inflated and before the scheme was exposed, Defendant R. Walton made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 20, 2020 | 450,000 | $151.29 | $68,080,500.00 |
| November 23, 2020 | 250,000 | $150.34 | $37,585,000.00 |
| November 25, 2020 | 10,000 | $151.88 | $1,518,800.00 |
| November 30, 2020 | 500,000 | $152.33 | $76,165,000.00 |
| December 1, 2020 | 177,513 | $152.54 | $27,077,833.02 |
| December 2, 2020 | 183,156 | $151.04 | $27,663,882.24 |
| December 3, 2020 | 239,331 | $149.36 | $35,746,478.16 |
| December 9, 2020 | 416,460 | $148.21 | $61,723,536.60 |
| December 10, 2020 | 413,653 | $147.53 | $61,026,227.09 |
| December 11, 2020 | 300,940 | $146.93 | $44,217,114.20 |
| December 14, 2020 | 204,721 | $146.82 | $30,057,137.22 |
| December 15, 2020 | 288,372 | $145.73 | $42,024,451.56 |
| December 16, 2020 | 328,703 | $145.97 | $47,980,776.91 |
| December 17, 2020 | 579,718 | $146.11 | $84,702,596.98 |
| December 18, 2020 | 917,433 | $146.49 | $134,394,760.17 |
| December 21, 2020 | 1,105,000 | $146.00 | $161,330,000.00 |
| December 22, 2020 | 376,398 | $144.63 | $54,438,442.74 |

Thus, in total, before the fraud was exposed, he sold 6,741,398 shares on inside information for which he received over $995 million in proceeds. His insider sales, made with knowledge of material non-public information, before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

55.     The 2020 Proxy Statement said the following about Defendant R. Walton, in relevant part:

> In addition to his duties at Walmart, Mr. Walton is involved with a number of non-profit and educational organizations, including Conservation International, where he previously served as Chairman of that organization's executive committee, and the College of Wooster, where he is an Emeritus Life Trustee for the college. Mr. Walton is also an Emeritus Trustee for the African Parks Foundation, U.S.

**Defendant S. Walton**

56.     Defendant S. Walton has served as a Company director since 2016. He also serves as Chair of the Technology and eCommerce Committee. In addition, he is the nephew of Defendant R. Walton. According to the 2020 Proxy Statement, as of April 9, 2020, Defendant S. Walton beneficially owned 167,061 shares of Company common stock. Given that the price per share of Company common stock was $121.80 as of that date, Defendant S. Walton owned approximately $20.3 million worth of Company common stock.

57.     For Fiscal Year 2020, Defendant S. Walton received $295,074 in total compensation, including $120,066 in fees and $175,008 in stock awards. For Fiscal Year 2019, he received $282,526 in total compensation, including $107,556 in fees and $174,970 in stock awards. For Fiscal Year 2018, he received $264,990 in total compensation, including $89,985 in fees and $175,005 in stock awards. For Fiscal Year 2017, he received $226,901 in total compensation, including $51,923 in fees and $174,978 in stock awards.

58.     The 2020 Proxy Statement said the following about Defendant S. Walton, in relevant part:

> Mr. Walton is also a member of the boards of directors of Flipkart Private Limited, Rapha Racing Limited, Crystal Bridges Museum of American Art, and the Smithsonian National Air and Space Museum. He is a graduate of Georgetown University Law Center, and he holds a bachelor's degree in business administration from the University of Colorado, Boulder.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

59.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Walmart and because of their ability to control the business and corporate affairs of Walmart, the Individual Defendants owed Walmart and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Walmart in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Walmart and its shareholders so as to benefit all shareholders equally.

60.     Each controlling shareholder, director, and officer of the Company owes to Walmart and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

61.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Walmart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62.     To discharge their duties, the controlling shareholders, officers, and directors of Walmart were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of Walmart, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also controlling shareholders, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Walmart's Board at all relevant times.

64.     As controlling shareholders, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

65.     To discharge their duties, the controlling shareholders, officers, and directors of Walmart were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the controlling shareholders, officers, and directors of Walmart were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arkansas, and the United States, and pursuant to Walmart's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Walmart conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Walmart and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Walmart's operations would comply with all applicable laws and Walmart's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.     Each of the Individual Defendants further owed to Walmart and the shareholders the duty of loyalty requiring that each favor Walmart's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

67.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Walmart and were at all times acting within the course and scope of such agency.

68.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Walmart, each of the Individual Defendants had access to adverse, non-public information about the Company.

69.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Walmart.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, violations of Sections 14(a)of the Exchange Act, and the claims alleged in the National Prescription Opiate Action and the Securities Class Action; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

72. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Walmart was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

**WALMART'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

74.     Walmart's Code of Conduct opens with a statement from Defendant McMillon which states that the Code of Conduct "applies to all of us—to me, to our Board members and officers, and to every Walmart associate."

75.     This is reiterated later in the Code of Conduct under the heading "Who is Covered by Our Code," which states in relevant part: "Our Code applies to all associates of Walmart and its subsidiaries. It also applies to Walmart's and its subsidiaries' board members when they are acting in their capacity as our directors."

76.     Under the heading, "Why We Have a Code," the Code of Conduct states that Walmart's "Code reinforces that Walmart is committed to complying with the laws and regulations in all locations that we operate."

77.     Under the heading, "When to Speak Up," the Code of Conduct instructs that, "[i]f you see, suspect, or are told about activity that violates our Code, compliance policies, the Standards for Suppliers, or the law, you must report it. . . . Report your concerns and cooperate fully and honestly in all internal investigations."

78.     Under the section, "Make Ethical Decision" the Code of Conduct states, in relevant part:

- **Follow the law.** Learn about the laws that apply to your role and our business.

- **Know our Code and live our values.** Review our Code and understand how it and our policies apply to your job. Associates must complete any required training on our Code and acknowledge that they have read and understand it.

- **Act in Walmart's best interest.** Never allow personal interests to impact the business decisions you make as a Walmart associate.

- **Be honest.** Be transparent and make decisions that reflect our values.

- **Lead by example.** Talk about our Code and our values with your fellow associates and team members.

- **When in doubt—reach out.** If you have questions or concerns, let your manager, People Lead, Ethics & Compliance, or Legal know.

79.    In a section titled, "Recognize and Avoid Conflicts of Interest," the Code of

Conduct states the following, in relevant part:

> Fair and objective decisions build trust with our associates, customers, and third parties. When making business decisions, we put Walmart's interests before personal interests. A conflict of interest occurs when personal interests interfere with, or may appear to interfere with, our work at Walmart. While we can't list every circumstance, it's important to know and avoid the common situations that could create a conflict or the perception of a conflict. Outside employment, financial investments, gifts and entertainment, and personal relationships are areas where conflicts can arise.

80.    In a section titled, "Deliver Quality Healthcare," the Code of Conduct states the

following, in relevant part:

- **Adhere to professional standards.** Maintain all professional licenses and certifications as required for your role. Report to your manager all issues associated with your ability to legally perform your job duties. Do not provide professional services beyond the authority of your licenses and certifications or if your required credentials lapse or are revoked.

- **Provide quality care.** Providing quality patient care in a safe and responsible manner is our mission. You are expected to exercise sound professional judgment and work to understand the healthcare needs of the patients you serve.

- **Properly handle and dispense prescription medication.** Follow all laws, regulatory entity rules, and policies for the safe handling, prescribing, and dispensing of prescription medication. Report accidental or improper prescribing or dispensing to your manager, in the established error reporting systems, or to Ethics & Compliance in a manner that complies with any applicable local privacy laws.

- **Protect patient confidentiality.** Prevent the improper use or disclosure of patient health information. Never look up patient information that is not needed for your role.

- **Bill fairly and accurately for products and services.** Payments received in error must be refunded, and all billing errors should be investigated and resolved. Billing for medical services must be accurate and timely, and services must be medically necessary.

- **Follow healthcare laws and our policies.** Know the health and wellness procedures that are relevant to your role and follow them.

81.     In a section titled, "Keep Accurate Records," the Code of Conduct states the

following:

- **Never falsify a record or account.** As a publicly traded company, Walmart has certain legal obligations to keep our records clear, accurate, timely, and complete. Never hide, alter, or disguise any business transaction.

- **Follow all internal processes and controls when creating and maintaining records.** Even if you are not directly responsible for the preparation of disclosures or financial reports, you are responsible for reporting accurate information in the business records you prepare. Properly record information— including approvals, costs, sales, expense reports, and time records—in accordance with company procedures.

- **Meet records management requirements.** Follow local records management and records retention policies.

- **Immediately report allegations of falsified financial records or interference with our internal controls on accurate financial reporting directly to Global Ethics & Compliance.**

82.     In a section titled, "Don't Misuse Inside Information," the Code of Conduct states

the following, in relevant part:

- **Do not trade on inside information.** Because Walmart is a publicly traded company in the U.S., we all must comply with U.S. securities laws, which include prohibitions on insider trading. If you have certain important or sensitive information about Walmart or our business partners that is not known to the public, it is illegal to buy or sell shares in Walmart or those other companies. Examples of inside information include financial results, pricing or marketing strategy changes, significant lawsuits or contracts, key management changes, and projections of future sales and earnings. If you are unsure whether something qualifies as inside information, contact Legal for advice.

- **Keep it to yourself.** Only share inside information with associates who need it to perform their jobs.

- **Do not share insider tips.** Do not share inside information outside of Walmart, even with family members or friends. When discussing inside information be aware of your surroundings to avoid someone overhearing.

83.     Walmart also maintains Corporate Governance Guidelines, which define additional

responsibilities for its directors. The Corporate Governance Guidelines state, in relevant part:

> The following Corporate Governance Guidelines have been adopted by the Board of Directors (the "Board") of Walmart Inc. ("Walmart" or the "Company") to assist the Board in the exercise of its responsibilities to our shareholders and the Company. These Guidelines should be interpreted in the context of all applicable laws and the Company's Restated Certificate of Incorporation, Amended and Restated Bylaws and other corporate governance documents. Therefore, these Guidelines are intended to serve as a flexible framework within which the Board may conduct its business and not as a set of legally binding obligations. The Board may, in its discretion, deviate from these Guidelines from time to time as the Board deems appropriate or as required by applicable laws and regulations.

> *     *     *

> **2. Director Responsibilities**

> The basic responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the shareholders and the Company, and to perform their duties of care and loyalty. In discharging that obligation, directors should be entitled to rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors, to the fullest extent permitted by law. . . .

> The specific duties and responsibilities of the Board will include, among other things, overseeing the management of the business and affairs of the Company; . . . overseeing the Company's policies with respect to compliance with applicable laws and regulations and adopting policies of corporate conduct designed to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls[.]

> *     *     *

> The Company shall engage in an agenda review process for each Board meeting, which shall include the Chairperson, the Lead Independent Director, and the chairperson of each Board committee. At the conclusion of this agenda review process, the Chairperson of the Board and the Lead Independent Director shall jointly approve the agenda for each Board meeting. At the beginning of the year, the Chairperson of the Board and the Lead Independent Director will establish a

schedule of agenda subjects to be discussed during the year (to the degree this can be foreseen). Each director is free to suggest the inclusion of items on the agenda. Each director is free to raise at any Board meeting subjects that are not on the agenda for that meeting. The Board will review the Company's long-term strategic plans and the principal issues that the Company will face in the future during at least one Board meeting each year. . . .

*    *    *

**8. Annual Performance Evaluation**

The Board and the committees will conduct annual self-evaluations to determine whether they are functioning effectively. The Nominating and Governance Committee will receive comments from all directors and report annually to the Board with an assessment of the Board's performance, as well as the performance of the committees. This will be discussed with the full Board following completion of the assessment. The assessment will focus on the Board's and each committee's contribution to the Company and specifically focus on areas in which the Board and each committee believe improvement could occur.

84.     The Company also maintains a document titled, "Reporting Protocols for Senior Financial Officers," which "Senior Financial Officers" are defined to include the CEO and CFO. The "Reporting Protocols for Senior Financial Officers" lists the following responsibilities, in relevant part:

1.     All Senior Financial Officers are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the Company with the Securities and Exchange Commission. Accordingly, it is the responsibility of each Senior Financial Officer to report any untrue statement of material fact and any omission of material fact of which he or she may become aware pertaining to information prepared by him or her or associates in his or her area(s) of responsibility that affect the disclosures made by the Company in its public filings.

2.     Each Senior Financial Officer shall report any information he or she may have concerning (a) significant deficiencies in the design or operation of disclosure and internal controls which could adversely affect the ability of associates in his or her area(s) of responsibility to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves any associate who has a significant role in his or her area's internal controls.

3.      Each Senior Financial Officer shall report any information he or she may have concerning any violation of these Reporting Protocols.

4.      Each Senior Financial Officer shall report any information he or she may have concerning evidence of a material violation of securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

85.      The Company's Audit Committee Charter also entrusts the Individual Defendants on the Audit Committee with additional responsibilities. The Audit Committee Charter states, in relevant part:

**Purpose**

The Audit Committee is appointed by the [Board] to: (1) assist the Board in the oversight and monitoring of (a) the integrity of the financial reporting process, system of internal control over financial reporting ("internal controls") and financial statements and reports of the Company, (b) the performance of the Company's global internal audit function, [and] (c) the compliance by the Company with legal and regulatory requirements[.]

*      *      *

**Committee Authority and Responsibilities**

The basic responsibility of the members of the Audit Committee is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders.

*      *      *

The Audit Committee shall oversee the integrity of the audit process, financial reporting and internal controls of the Company, oversee the work of the Company's management, global internal auditors (the "Internal Auditors") and the Outside Auditor in these areas, oversee management's development of, and adherence to, a sound system of internal controls, review whether the Internal Auditors and the Outside Auditor objectively assess the Company's financial reporting, accounting practices and internal controls, and provide an open avenue of communication among the Outside Auditor, the Internal Auditors and the Board. It is the responsibility of . . . management of the Company, under the oversight of the Audit Committee and the Board, to assure compliance by the Company with applicable legal and regulatory requirements[.]

*      *      *

Financial Statement and Disclosure Matters

29

1.     Review and discuss with management, and to the extent the Audit Committee deems necessary or appropriate, the Internal Auditors and the Outside Auditor, the Company's disclosure controls and procedures that are designed to ensure that the reports the Company files or submits with the Commission comply with the Commission's rules and forms.

*          *          *

10.     Receive and review disclosures made to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Company's Annual Report on Form 10-K and Quarterly Report on Form 10-Q about (a) any significant deficiencies in the design or operation of internal controls or material weakness therein, (b) any fraud involving management or other associates who have a significant role in the Company's internal controls, and (c) any significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation.

Ethics and Compliance Oversight Responsibilities

29.     Discuss with management and the Outside Auditor, and advise the Board with respect to, the Company's policies, processes and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics, and instances of non-compliance therewith. Obtain and review reports and disclosures of insider and affiliated party transactions.

86.     In violation of the Code of Conduct, the Company's corporate governance documents, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of Sections 14(a) of the Exchange Act, and the claims alleged in the Securities Class Action, and aiding and abetting thereof.  Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct and relevant corporate governance, the Individual Defendants failed to maintain the accuracy of Company

records and reports, comply with laws and regulations, conduct business in an honest and ethical

manner, and properly report violations of the Code of Conduct and the law.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

### *The Controlled Substances Act and Walmart's Roles Under It*

87.     The Controlled Substances Act aims, *inter alia*, to prevent the diversion of legal

controlled substances—such as opioid medication—to unlawful purposes, like the unlicensed or

illegal use and sale of opioid medication. Examples of such diversion would include a physician

writing a prescription for someone who does not have a medical need for the drug, an individual

stealing the medication, or a pharmacist improperly distributing the drug to someone without a

valid prescription.

88.     The CSA and the regulations promulgated under it address each part of the drug

supply chain to prevent the diversion of legal drugs for illegal purposes. This includes requiring

manufacturers, distributors, prescribers, and pharmacies which deal in controlled substances—

defined under the CSA and its regulations—to register with the DEA. *See* 21 U.S.C. §§ 822(a)(2)

and 823(f). Walmart, as both a pharmacy operator and distributor of controlled substances, was

registered under the CSA and therefore agreed to be bound by the obligations which arose under

it. *See* 21 U.S.C. §§ 822(a)–(b), 823(f); 21 C.F.R. §1300.02(b).

89.     In the pharmacy context, per the CSA, "dispensing" a drug is the delivery of the

controlled substance to the user per the terms of a physician's prescription. 21 U.S.C. § 802(10);

21 C.F.R. §§ 1300.01, 1306.03(a). By the same token, the CSA prohibits the dispensing of most

controlled substances if it is not per the terms of a prescription. 21 U.S.C. §§ 829(a), (b); 842(a)(1).

90.     Walmart, in its capacity as a pharmacy, dispensed controlled substances, notably

opioids, to consumers during the Relevant Period.

91.     The United States Attorney General has promulgated rules regarding when prescriptions may be filled under the terms of the CSA, 21 U.S.C. § 829. *See* 21 C.F.R. § 1306.01. Part 1306 has three rules that pharmacies must follow. A pharmacist must first determine that the prescription was issued by a licensed medical practitioner in the usual course of their practice; the pharmacist must next determine that the prescription is for a legitimate medical purpose; and finally, the pharmacist must adhere to the usual court of their own practice in filling the prescription. As stated, Walmart, as a pharmacy, was bound by these rules.

92.     Pharmacists are not permitted under law to rely exclusively on the fact that a prescription was issued by a licensed medical professional in determining the validity of prescriptions. Pharmacists are instead required to consider "red flags" when they appear and when their appearance brings into question the validity of a prescription which a medical professional has admittedly issued. Such "red flags" include, but are not limited to, a medical professional who issues large quantities of controlled substances, for example a doctor who issues prescriptions for opioids in large quantities to large number of patients; prescriptions which are themselves dangerous, for example certain combinations of drugs which are known to be susceptible to abuse and/or dangerous in combination; and the circumstances of the patient themselves, for example a customer who the pharmacist knows always fills their large opioid prescription early.

93.     Pharmacists are not left on their own in identifying red flags and making determinations based on their appearance, but instead receive substantial training on the topic as part of their professional training, continuing education, and licensing. In 2014, as just one example, the National Association of Boards of Pharmacy released, "Red Flags," an educational video which asserted that "by recognizing red flags to help establish the validity of a prescription, the pharmacist becomes the last line of defense in preventing misuse," and "problem prescriptions

32

can often be identified by using common sense, practicing good pharmacy, and looking for red flags that suggest the prescription may not be legitimate."

94.     When a red flag arises and is then resolved in the course of a pharmacist's practice, they are required to document how the red flag was resolved. As such, if a pharmacist is following their training and the law, two possible conclusions should occur when faced with a red flag. Either the pharmacist refuses to fill the prescription, or the pharmacist is able to resolve the red flag, documenting the incident. This documentation is a useful tool because it allows a pharmacist a point of reference in the future. For example, a patient may have a legitimate medical necessity for a recurring, large quantity of opioids and if a pharmacist has recorded this, it will expedite resolution in the future. On the contrary, a lack of documentation is a sign that the pharmacist did not resolve a red flag. Moreover, failing to resolve red flags in this way, or if one cannot resolve the red flag then refusing to fill the prescription, is a violation of 21 C.F.R. § 1306.06, requiring a pharmacist to dispense controlled substances while adhering to the usual course of their professional practice.

95.     Corporations whose agents dispense drugs under the CSA and its regulations can be held liable for their violations. *See* 21 C.F.R. §§ 1300.01, 1306.02.

96.     In addition to operating as a pharmacy, Walmart operated as a distributor during the Relevant Period, at least until 2018. A distributor delivers controlled substances to dispensers. In Walmart's case, this meant that Walmart had its own in-house distribution network for getting drugs to their pharmacies in the first place. In fact, from 2012 to 2018, Walmart operated the largest self-distribution network in the United States for oxycodone, hydromorphone, and hydrocodone—different prescription opioids.

97.     Like pharmacies, distributors fall under the CSA and implementing regulations. The DEA, the implementing agency, evaluates whether distributors have "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels[;]" whether they comply with state and local laws, whether they have been previously convicted for the illegal sale of controlled substances, the distributors past experience, and any other factors deemed relevant. 21 U.S.C. § 823(b), (e).

98.     Thus Walmart, as a distributor, was required to have effective controls against the diversion of controlled substances, including but not limited to the adequate reporting of suspicious orders, or to face enforcement action, including civil penalties of up to a $10,000 per violation.

### *Opioid Medication*

99.     Opioids are a class of prescription painkillers that are both very effective at combatting pain and very prone to rendering patients addicted. Even for legitimate long-term users, the cessation of use will typically result in withdrawal symptoms. In addition, over time, opioid patients begin building a tolerance to the drug, and require increasingly higher doses to achieve the same effect. This cycle means that opioids pose an ever-present risk of addiction followed by withdrawal or overdoes.  As such, opioids are classified as a Schedule II Controlled Substance, reflecting their "high potential for abuse, with use potentially leading to severe psychological or physical dependence."

100.    Since the 1990s, following the efforts of opioid manufacturers to have opioids' use greatly expanded by convincing prescribers of their safety, opioid use has skyrocketed. The efforts by manufacturers included deceptive marketing to the effect that long-term opioid use could improve patients' quality of life, that addiction, overdose, and death posed insignificant risks, that

opioids were more effective at treating pain than they in fact were, and that withdrawal was both less difficult and less common than was actually the case.

101.   From 2000 to 2011, the sale of prescription opioids quadrupled. In 2012, approximately 259 million opioid prescriptions were written, enough to dose every adult American uninterrupted for a month. Today, opioids are the most prescribed drugs in America.

102.   This has resulted in a public health emergency, with millions of people in the United States suffering from addiction and with over 200,000 people dead in the last twenty years. Overdose is the leading cause of death for Americans under fifty and life expectancy has decreased for the first time ever, driven in part by the sheer number of opioid-related deaths.

103.   The problem is a bipartisan one, with President Obama stating that "[p]rescription drug abuse is the Nation's fastest growing drug problem" and later signing into law the Comprehensive Addiction and Recovery Act of 2016, authorizing $181 million in annual funding to combat the threat posed by opioids. Likewise, President Trump declared the opioid epidemic a public health emergency in October 2017.

### *Walmart's Opioid Sales*

104.   Walmart filled large numbers of invalid opioid prescriptions during the Relevant Period, many of which Walmart knew were not for legitimate medical purposes and/or which were not issued in Walmart's pharmacists' ordinary course of professional practice.

105.   This knowledge was evidenced by Walmart's filling of prescriptions written by certain physicians who had been flagged as over-prescribers by Walmart's own pharmacists. These pharmacists would fill out and submit "refusal-to-fill" forms to the Company's compliance department, which was in charge of Walmart's dispensing operations throughout the country.

106.     Moreover, Walmart filled prescriptions which themselves were red flags, due to the amount, dose, or combination of drugs which the prescription called for as well as the prescribing pattern. Prescriptions such as these are such strong indicators of drug abuse or other diversion that Walmart and its pharmacists knew at least some of these prescriptions could not be valid.

107.     In addition, Walmart pharmacists would, numerous times throughout the Relevant Period, fill prescriptions with unresolved red flags which other Walmart pharmacists had denied because of those red flags.

108.     From the red flag information collected as part of Walmart's pharmacy operations, Walmart's national compliance unit knew its pharmacies were filling prescriptions which were not for legitimate medical purposes, which were not written by physicians in the usual course of their practice, and which were not filled by Walmart's own prescribers in the usual course of their practice. Walmart filled these prescriptions notwithstanding this knowledge in violation of 21 C.F.R. §§ 1306.04(a) and 1306.06.

109.     These numerous, repeated CSA violations were not honest mistakes, but the result of Walmart's disregard for its duties under the CSA; its practice of pressuring its pharmacists to fill as many prescriptions as they could as quickly as possible, preventing them from adequately exercising their professional judgment as to the validity of prescriptions; its not sharing red-flag information with its pharmacists which would have allowed them to better deny invalid prescriptions, and Walmart's not providing its pharmacists with adequate resources to comply with the law concerning their dispensing obligations.

### *Pressuring Pharmacists*

110.     Walmart operates pharmacies, and other businesses, within their stores, in part, as a business strategy to entice customers through the doors who will then also purchase other goods

once there. In its annual report for Fiscal Year 2017 filed with the SEC on March 31, 2017 on Form 10-K (the "2017 10-K"), Walmart disclosed that one of the risks it faced if it sold less pharmaceuticals was "the loss of cross-store or -club selling opportunities [which would,] in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity." In line with this business strategy, Sam's Club, a division of Walmart, would sometimes offer steep discounts on opioids to increase the inflow of customers, driving "cross-club selling opportunities."

111.   For Walmart, part of getting customers to spend their money in other parts of the store meant getting them out of the pharmacy as fast as possible. In a December 17, 2014 email sent to some Walmart pharmacists, they were advised that "shorter wait times keep patients in our store." Additional emails advised that if customers' prescriptions were not filled quickly enough, they would take their business elsewhere.

112.   At odds with pharmacists' legal and ethical obligations to comply with red flag resolution and reporting requirements, Walmart's managers told pharmacists to "[h]ustle to the customer [and] hustle from station to station" because filling prescription was "a battle of seconds." Managers compiled and shared data with pharmacists tracking the volume of drugs dispensed and customer wait times, ranked stores by volume of drugs sold, congratulated pharmacies on high volumes, and fostered competition among Walmart pharmacies to dispense more prescriptions than one another.

113.   Walmart Health and Wellness Directors sent numerous emails to pharmacists, advising them to fill prescriptions in under twenty minutes, and then in under fifteen minutes. Even when pharmacists pushed back, pointing out the number of steps they had to go through to fill a

prescription, the Health and Wellness Directors maintained that all the steps should be completed in fewer than fifteen minutes.

114.    In addition, Walmart employed Pharmacy Facility Management Incentive Plans, since at least 2013, which determined bonuses for pharmacy employees based in part on the number of prescriptions which the pharmacy filled.

115.    This pressure from above did not go unnoticed by pharmacy staff. In internal employee surveys from June 2012, July 2014, and October 2014, pharmacy employees reported they were insufficiently staffed to keep up with management's demands. The June 2012 survey revealed only 59% of pharmacy staff felt they had sufficient employees on hand to handle the workload. This dipped to 43% by the time of the October 2014 survey. Employees also reported they felt rushed in the prescription filling process in both the June 2012 and October 2014 surveys, and included written comments asking for more staff and more time to allow them to adequately do their jobs.

### *Walmart's Internal Pharmacy Compliance*

116.    Walmart housed its pharmacies under its Health and Wellness Division, which had its own compliance team located at the Company's headquarters. The compliance team, as the name suggests, was tasked with maintaining compliance with applicable federal and state laws applying to Walmart's pharmacy operations. As part of their compliance duties, this compliance team answered legal and ethical questions and responded to concerns from Walmart's pharmacists and distribution network staff, as it related to controlled substances.

117.    In addition, Walmart had a Pharmacy Operations Manual (the "Manual") as a frontline resource to aid its pharmacists in complying with their legal obligations. The Manual

contained an acknowledgement from Walmart that it was bound by legal requirement as part of its role in dispensing controlled substances.

118.   In March 2009, prior to the Relevant Period, the Company added a policy to the Manual, titled "Practitioner/Patient Relationship" which included a nonexclusive list of factors which pharmacists should consider in filling prescriptions, including whether the prescription was for large amounts of certain types of medication and whether the prescription bore any indicia of having been rejected elsewhere (the "Manual Policy").

119.   In March 2011, the Manual Policy was updated to include additional red flags, including out-of-state prescriptions and prescriptions "written by a doctor or for a patient for whom the pharmacy has rejected other prescriptions for a failure to have an appropriate doctor-patient relationship." In addition, the Manual Policy was updated to reflect that Walmart's pharmacists should only dispense prescriptions if the pharmacist could resolve any present red flags, and that such resolution should be documented. It stated that only if the pharmacist "reasonably believe[d]" the prescription was valid after speaking with the prescriber should the pharmacist fill the prescription. And if the pharmacist did this, they should "make a notation on the prescription" indicating their name, the prescriber's name, the date they spoke with the prescriber, and the phrase "proper relationship verified." This updated Manual Policy was in effect thought January 2014, at least.

120.   Walmart later updated the Manual Policy again around April 2015. As updated the Manual Policy specifically addressed the CSA-imposed obligation that pharmacists dispense controlled substances only where there was a valid prescription for a legitimate medical purpose issue in the context of a proper prescriber-patient relationship. If there were red flags, they "should be evaluated, resolved, and documented. The Manual Policy as updated quoted 21. C.F.R

§ 1306.04 and advised that it was under this regulation that the DEA undertook criminal enforcement action against pharmacies.

121.    The Manual Policy, as originally written and as updated, demonstrates Walmart's knowledge of its obligations under the law.

### The Memorandum of Agreement and Subsequent Developments

122.    Notwithstanding its compliance policies, the DEA found that a California Walmart had violated its obligations by filling prescriptions which Walmart knew, or should have known, were not issued for legitimate medical purposes or which were not issued by a prescriber acting in the usual course of their practice. To resolve the matter, Walmart and the DEA entered into a nationwide MOA in March 2011 which was to last through March 2015. Per its terms, Walmart agreed to implement a nationwide "compliance program, updated as necessary, designed to detect and prevent diversion of controlled substances as required by the [CSA] and applicable DEA regulations." The to-be-implemented compliance program "shall apply to all current and future Walmart pharmacies registered with the DEA" and "shall include procedures to identify the common signs associated with diversion of controlled substances, including but not limited to, doctor-shopping, requests for early refills, altered or forged prescriptions, prescriptions written by doctors not licensed to practice medicine in the jurisdiction where the patient is located, and prescriptions written for other than a legitimate medical purpose by an individual practitioner acting outside the usual course of his professional practice."

123.    Moreover, the MOA required Walmart to implement policies to block early refills, to allow pharmacists to obtain and review patient or doctor profiles before dispensing prescriptions, to verify DEA registration numbers on prescriptions, to comply with all applicable law, and to notify the DEA when Walmart refused to fill suspicious prescriptions. The MOA

contained a statement that "Walmart acknowledges and agrees that the obligations taken in this subparagraph do not fulfill the totality of its obligations under the CSA and its implementing regulations."

124.    In 2016, the DEA conducted a raid on Walmart for filling suspicious opioid prescriptions issued by two physicians who were under investigation at that time. The physicians were later convicted for illegal distribution of opioids. In the context of the raid and the ensuing investigation, the DEA discovered that Walmart had been filling large quantities of suspicious opioid prescriptions from 2011 to 2017.

125.    While this was happening, Walmart's pharmacists expressed various concerns to the compliance unit, which in one case responded by stating that Walmart's focus was on "driving sales." When Walmart did undertake actions under its compliance program, it was later rather than sooner. In the case of a prescriber who multiple pharmacists reported as issuing suspicious prescriptions, Walmart only began blocking that prescriber's prescriptions after they had been indicted.

126.    According to a March 25, 2020 *ProPublica* report:

Opioids dispensed by Walmart pharmacies in Texas had killed customers who had overdosed. The pharmacists who dispensed those opioids had told the company they didn't want to fill the prescriptions because they were coming from doctors who were running pill mills. They pleaded for help and guidance from Walmart's corporate office. Investigators had obtained records of similar cries for help from Walmart pharmacists all over the country: from Maine, North Carolina, Kansas and Washington, and other states. They reported hundreds of thousands of suspicious or inappropriate opioid prescriptions. One Walmart employee warned about a Florida doctor who had a "list of patients from Kentucky that have been visiting pharmacies in all of central Wisconsin recently." That doctor had sent patients to Walmarts in more than 30 other states. In response to these alarms, Walmart compliance officials did not take corporatewide action to halt the flow of opioids. Instead, they repeatedly admonished pharmacists that they could not cut off any doctor entirely. They could only evaluate each prescription on an individual basis. And they went further. An opioid compliance manager told an executive in an

email, gathered during the inquiry and viewed by ProPublica, that Walmart's focus should be on "driving sales."

127.    The article quoted a Walmart pharmacist as stating "[w]e are all concerned about our jobs and about filling for a pill mill doctor." Another stated filling the invalid opioid prescriptions "is a problem and a liability on us…. Filling for him is a risk that keeps me up at night. This is a serious situation." That pharmacist went so far as to write to Walmart headquarters "Please help us." Even in light of this, *ProPublica* reported that "after more than a decade of soaring addiction and deaths had transformed opioids into a national crisis, Walmart had a policy that pharmacists could conduct no 'blanket refusals' that shut off prescriptions written by a particular doctor" and that the MOA remained secret.

### *Walmart Did Not Share Red Flag Information in Its Possession*

128.    As stated, Walmart, as a pharmacy operator, was required to, and did, compile information concerning red flags which arose in the course of its filling prescriptions. This information was documented by pharmacists in the ordinary course of their practice and sent to the national compliance unit in Bentonville, Arkansas. Walmart did not make this information, already collected, available among its pharmacists, which severely hampered the pharmacists' ability to comply with their legal responsibilities and prevent the diversion of opioids.

129.    While Walmart was operating under the terms of the MOA, from 2011 to 2015, prior to the Relevant Period, the national compliance unit at Walmart did in fact have a spreadsheet of information collected from the refusal-to-fill forms sent to it by Walmart's pharmacists. They shared this information with the DEA but removed the pharmacists' written comments so that the DEA did not see why the pharmacists refused to fill a given prescription. Walmart did not share this information with pharmacists, even though this information would have been invaluable in

giving the pharmacists a better understanding of which prescriptions and which prescribers should be considered red flags.

130.     Thus, Walmart's pharmacists lacked a system to alert them to red flags which were known to the compliance unit and were under such stringent time pressures that they were in most cases unable to request or receive adequate information from the compliance unit before filling prescriptions in any event.

131.     This failing was recognized by the compliance unit, but nothing was done to fix it. Walmart compiled a "Controlled Substances Work Group" which issued a 2013 report that stated the Company should "[e]stablish a process for the analysis of refusal to fill data and reporting problematic prescribers or patients internally." To do so, the Controlled Substances Work Group acknowledged that the Company would need to "disseminate refusal to fill decisions and/or problematic prescribers and patients within the same trade area or to the entire corporate entity." In addition, also in 2013, the compliance unit set out a "Success Measure" of establishing "a process for reporting prescribers or patients internally." Thus, two years into the MOA, Walmart was still not adequately using the red flag information already in its possession to prevent the diversion of opioids.

132.     What Walmart was doing was driving sales. A Walmart compliance director stated in 2015 that the compliance unit "had not invested a great amount of effort" into analyzing data and instead that "[d]riving sales and patient awareness" was "a far better use of our Market Directors and Market Manager's time."

133.     Until 2015, there was not even a way for Walmart pharmacists to look-up other pharmacists' refusal-to-fill forms. A pharmacist would only know about a certain prescriber's or patient's red flags if they were told by another pharmacist, essentially useless for pharmacists

working in different locations, or if they contacted the national compliance unit and received the information which, as stated, was difficult to do under the inordinate time pressures Walmart pharmacists typically operated under. Only in 2015 was the compliance platform "Archer" introduced, which allowed for a search of refusal-to-fill forms, but which would not present red flag information about prescribers or patients without prompting.

134.     In fact, Walmart's compliance unit, in general, took no steps to resolve or investigate red flags. This included having no mechanism, policies, or procedures in place to regularly obtain publicly available information, from state prescription drug databases, medical licensing boards, or public criminal records, which, in many cases, would have substantiated pharmacists concerns or otherwise alerted Walmart pharmacy employees to the invalidity of some prescriptions. Nor did the compliance unit communicate with other pharmacies which certain prescribers' prescriptions, nor, in most cases, did the compliance unit follow up even with Walmart's own pharmacists when they refused to fill certain prescriptions.

135.     Thus, though Walmart had collected, or otherwise had available to them, copious amounts of pertinent information to assist them in preventing the diversion of prescription opioids, Walmart made effective use of almost none of it and had no effective means of communicating this information to its pharmacists to assist them in complying with the CSA or the MOA.

### *Walmart's Policy Against Blanket Refusals*

136.     For years, Walmart refused to implement blank bans even against prescribers which its own pharmacists had identified as "pill mills," *i.e.*, doctors illegally overprescribing opioids to patients who did not have a legitimate medical need for them. The compliance unit advised pharmacists that even for these so-called pill mills, the pharmacists should undertake to make an individualized assessment of the prescription in front of them, an approach that was very difficult

to implement in a robust way when management simultaneously wanted all prescriptions filled in under fifteen minutes.

137.    The Manual Policy, following its 2011 update, stated as much: "Blanket refusals of prescriptions are not allowed. A pharmacist must make an individual assessment of each prescription and determine that it was not based on a valid prescriber-patient relationship or for a valid medical reason before refusing to fill." The compliance unit justified this policy, based in part, on the assertion that "no blanker refusals are allowed by Boards of Pharmacy." However, this was untrue. And in 2014, the compliance unit changed its tune by acknowledging that it needed "to determine if pharmacists may exercise their discretion to impose blanket refusals." Eventually, the compliance unit did allow blanket refusals.

138.    While this policy shift was a step in the right direction, the refusal of Walmart to implement this policy for years led to thousands of invalid prescriptions being filled nationwide, each one a separate CSA violation. Walmart pharmacists, working under the Company's self-imposed immense time constraints, could not fill out individual refusal-to-fill forms for each pill mill prescription without burying themselves in paperwork. Moreover, if a pharmacist's primary red flag indicator was the prescription's origin, a pill mill, because the Company did not have adequate red flag information sharing infrastructure and because pharmacists were required to make "individual assessments," they might feel they did not have adequate justification to reject a pill mill prescription in the absence of a pill mill blanket ban.

### *Walmart Filled Prescriptions Regardless of Red Flags*

139.    Walmart's Manual Policy, following its 2015 update, defined some red flag drug combinations include multiple immediate-release opioids; immediate-release opioids paired with methadone, itself a long-acting opioid; and opioids combined with other drugs commonly diverted

for illegal and abusive purposes, such as benzodiazepines, muscle-relaxers, sedatives, or stimulants. Still, Walmart's pharmacists filled thousands of such prescriptions without resolving the red flags or even documenting them.

140.    In addition, Walmart's Manual Policy, following its 2015 update, reflected that prescriptions "for an unusually large quantity or high starting dose" constituted red flags. In fact, this reason was cited in many Walmart refusal-to-fill forms. Still, other Walmart pharmacists had no problem filling these types of prescription.

141.    In a similar vein, patients who request refills early, particularly patients who do this repeatedly, pose a red flag. This indicates a patient has used up the medication by taking it more frequently than prescribed or otherwise diverting the medication to others. Still, Walmart filled these types of prescriptions, even though many of them were refilled so early that a pharmacist acting in the usual course of their practice should have documented the red flag and either resolved it, with documentation, or otherwise refuse to issue such refills.

142.    In particularly flagrant violation of Walmart's obligations under the CSA, Walmart pharmacists also filled opioid prescriptions exhibiting red flags which other Walmart pharmacists had earlier refused. Thus, even if an invalid prescription was properly refused at a Walmart, all a person had to do, in some cases, was go to a different Walmart or wait for shifts to change to fill their invalid prescription.

143.    Taking together, Walmart filled thousands of prescriptions which its pharmacists knew at the time were invalid, or which they strongly suspected were invalid without undertaking efforts to resolve the red flag indicators or otherwise to document the suspicious prescriptions. This constituted a violation of Walmart's dispensing obligations under 21 C.F.R. § 1306.04(a) and § 1306.06.

*Walmart as a Distributor*

144.    From 2000 to around May 2018, Walmart operated its own internal distribution network to ship controlled substances to its pharmacies. This system made tens of millions of shipments and was, from 2012 to 2018, the largest self-distributor in the United States for the opioids oxycodone, hydromorphone, and hydrocodone. As a distributor, Walmart was required, pursuant to 21 C.F.R. § 1301.74(b), to have a system in place to detect and to report to the DEA shipments of unusual size, pattern, or frequency, or bearing other suspicious indicia. Walmart, in violation of 21 C.F.R. § 1301.74(b), did not have an adequate system in place and did not detect, or in any event did not report, hundreds of thousands of suspicious orders to the DEA.

145.    As an operator of pharmacies Walmart had access to troves of data—data which other distributors without pharmacies might not necessarily have—that could have been brought to bear in fulfilling its obligations under the CSA. This data included the ultimate end-users of controlled substances, the identity of the prescribers issuing them, prescriptions quantity and dosages, and the documentation of Walmart pharmacists who expressed concerns over certain prescriptions. Other information which Walmart had access to in flagging suspicious orders and reporting them to the DEA included specific instances where Walmart pharmacists refused to fill the prescriptions of certain prescribers; pharmacists identification of certain prescribers as operating pill mills; relevant knowledge of Walmart's pharmacy staff, including not only pharmacists but also managers and marketing directors; the distances between prescribers, patients, and pharmacies, with great distances being evidence of diversion; the identity of patients who paid cash for prescriptions; drug diversion trends which Walmart became aware of as a pharmacy operator; and DEA Forms 106, reporting theft or loss of controlled substances, which Walmart filed.

146.     In addition, as a distributor, Walmart had data concerning the quantity of each of its pharmacies current orders; order histories and patterns; the occurrence of Walmart pharmacies relying on other distributors to fill their demand, which sometimes exceeded these distributors limits and was reported to the DEA; orders which Walmart flagged as suspicious for a variety of reasons; data analytics regarding the quantity of controlled substances sold, including as a ratio to other drugs; suspicious-order reports which the Company prepared; and the contents of Walmart's suspicious order monitoring and remediation plans. Walmart touted its sophisticated data analytics capability which purportedly can "enhance, customize and optimize the shopping experience" and "make Walmart pharmacies more efficient[.]"

147.     Walmart knew that in some locations, it was shipping huge quantities of opioids which stood in stark contrast to the small populations of the surrounding areas. Yet Walmart's data analytics programs either did not flag these shipments as suspicious or if it did this was never reported to the DEA.

### *Walmart's Suspicious Order Monitoring Program Prior to the Relevant Period*

148.     Walmart, as required by law, did purportedly have in place a system to flag and report suspicious orders to the DEA. However, this program had material defects which let hundreds of thousands of suspicious orders go unreported, and even as Walmart made changes to the program, it did not fix the deficiencies.

149.     Until 2010, Walmart had no formal criteria for its employees to use in evaluating what orders should be subject to further review. Thus, while Walmart did have employees tasked with reviewing orders, speaking to its pharmacies about those orders, and triggering increase scrutiny where necessary, these employees were basically left on their own about when and why they should trigger further review. The hourly employees tasked with these jobs were reviewing

hundreds of orders a day, and without any formal guidance very few, if any, orders were flagged as suspicious under this system.

150.    As such, suspicious orders were shipped regularly. In December 2007, the DEA sent Walmart, and other distributors, a letter reinforcing them that, pursuant to 21 C.F.R. § 1301.74(b), they needed to have a system in place to detect and report suspicious orders. The letter continued that:

> [A]ll registrants—manufacturers, distributors, pharmacies, and practitioners— share responsibility for maintaining appropriate safeguards against diversion. Nonetheless, given the extent of prescription drug abuse in the United States, along with the dangerous and potentially lethal consequences of such abuse, even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm.

151.    Despite this reminder, Walmart still did not implement a formal policy until November 2010. At that time, Walmart implemented a policy titled "Pharmacy Manual 21-402 ("Controlled Substance Monitoring")."[2]

152.    Under Policy 21-402, the Walmart employees who oversaw the relevant parts of Walmart's distribution operations had to review a monthly report called a "control drug stock exception repot" and if a pharmacy ordered so much of any one drug that it surpassed 3.99% of the pharmacy's prior month purchase, then they would report it. However, Policy 21-402 was flawed for many reasons. For example, if a pharmacy ordered large quantities of numerous drugs, even a very large shipment, in raw numbers, of a controlled substance liable to be abused would go unreported if the shipment fell below the 3.99% of aggregate purchases threshold. Moreover, orders which might be considered suspicious due to their frequency or their adherence to a pattern might go unreported if the orders fell below the requisite percentage threshold.

---

[2] "Pharmacy Manual 21-402 ("Controlled Substance Monitoring")" will be referred to herein as "Policy 21-402."

153. Around 2011, Walmart began operating under a new order alert system, titled "Reddwerks." This system was an improvement over the prior one by marking as suspicious any order of fifty or more bottles of the same controlled substance or any order which was 30% above than a four-week average for that item. Notably, orders first needed to meet a ten bottle per week minimum in order to trigger the 30% above a four-week average system. Thus, for example, if a certain pharmacy usually ordered two bottles of a controlled substance per week, then inexplicable it began ordering nine bottles a week, the system would not flag this event.

154. In July 2012, Walmart further tightened measures by placing a strict twenty bottle cap on 30-milligram oxycodone pills. In addition, Walmart promulgated an internal document stating that any Schedule II controlled substance, covering many prescription opioids, that was ordered in excess of twenty bottles would become subject to additional review. However, this policy was not strictly adhered to. Instead, what became common practice was if an order for more than twenty bottles was placed, Walmart simply shipped twenty bottles and did not follow up. Though Walmart maintained a list of some of these orders, few if any were followed up on, and the twenty bottle shipments were still made notwithstanding the pharmacies' inclusion on the list.

155. Things changed in the middle of 2014, when Walmart realized that its practices were exposing it to DEA enforcement action. In now-public emails, Walmart recognized that it needed to change its shipment order monitoring program "to help Walmart avoid DEA enforcement as a result of noncompliance with 21 C.F.R. 1301.74(b)."

156. In July 2014, Walmart issued a revised Policy 21-402, retitled "Evaluating Orders of Interest and Suspicious Order Reporting" ("Revised Policy 21-402"). Under Revised Policy 21-402, employees in the compliance unit were know required to evaluate individual order for suspiciousness and report any individual suspicious orders to the DEA. Revised Policy 21-402

required employees to flag any "orders of interest," then determine if these "orders of interest" were "suspicious orders" and if so to report the suspicious orders to the DEA. This did not occur. Instead, numerous suspicious orders still were not even identified as "orders of interest" and therefore were never escalated to suspicious orders. Even of the "orders of interest," follow up regularly did not occur as Walmart prized efficiency and on-time delivery rather than legal compliance.

### *Walmart Did Not Report Unusually Large Orders*

157.    As discussed above, prior to Revised Policy 21-402 (promulgated in July 2014), Walmart nominally used the existence of unusually large orders as its primary means of detecting suspicious orders, and deployed ratio measuring and numerical caps in an effort to combat suspicious orders. Even under that regime unusually large orders could still be made through loopholes, as described above, and on occasion limits were exceeded in any event.

158.    Even when respected, uniform order caps made little sense in light of Walmart's drastically different markets. Limiting both a Walmart in Los Angeles, California and a Walmart in Cabell County, West Virginia to twenty bottles of certain opiates would have differing efficacy in combatting diversion just due to the stark population differences between such localities before even considering their different market forces and patient needs.

159.    In a November 23, 2014 email, Walmart circulated a document—"Overview of SOM [Suspicious Order Monitoring] Project Progress"—which recognized Walmart's policy of setting order limits "regardless of store history." Further the document recognized that Walmart's threshold for flagging Schedule III, IV, and V drugs, of more than fifty bottles per shipment, was essentially arbitrary, without any meaningful supporting rationale.

160.    As a result of these inadequate, untailored limits, Walmart did not detect or report numerous unusually large orders.

**Walmart Justified Not Reporting Suspicious Orders by Reducing Them Prior to Shipment**

161.    Another practice Walmart engaged in to not report suspicious orders to the DEA was to simply ship an amount that was permitted under Walmart's policies even if the order, as received, was above Walmart's limits. The Company would not report receiving the excessive orders to the DEA, even for pharmacies which repeatedly had to have their orders reduced to conforming levels. This applied to orders above its twenty-bottle Schedule II limit, including the hard limit on oxycodone, as well as its fifty-bottle Schedule III, IV, and V limits.

162.    On October 12, 2013, an Operations Manager at the Walmart distribution center which handled all oxycodone 30 mg shipments sent an email stating that Walmart had a "standing" order to reduce oxycodone orders so that "[a]ny order over 20 bottles of this item is cut back to 20 bottles."

163.    An Operations Manager at a Walmart distribution center, on October 16, 2014, sent around a report to Walmart compliance employees demonstrating this practice of reducing suspicious orders:

| Date | Store | NDC | Description | Item Pack Quantity | Ordered | Sent |
|------|-------|-----|-------------|-------------------|---------|------|
| 10/15/2014 | 1783 | 603388721 | HYD/BIT/ACET 10/325 | 100 | 63 | 50 |
| 10/15/2014 | 5133 | 406012501 | HYDRO/APAP 10/325MG | 100 | 82 | 50 |
| 10/15/2014 | 1575 | 406012501 | HYDRO/APAP 10/325MG | 100 | 76 | 50 |
| 10/15/2014 | 1951 | 406012501 | HYDRO/APAP 10/325MG | 100 | 63 | 50 |

164.    While these orders shipped below Walmart's internal reporting limits, they were placed above the limit and Walmart was aware of this. Walmart did not report these large orders to the DEA. The practice of reducing unusually large orders without reporting the order, as placed, to the DEA stymied enforcement and was a violation of regulations promulgated by the DEA. In

February 2015, DEA diversion investigators told Walmart that this practice violated 21 C.F.R. § 1301.74(b).

165.    Notwithstanding the Company's knowledge of the practice and their knowledge that it violated DEA regulations, the practice continued through at least November 29, 2017.

### Walmart Ignored Indicia of Diversion Raised by Its Pharmacies

166.    21 C.F.R. § 1301.74(b) includes as examples of suspicious orders those of unusual size, frequency, or pattern, but also includes orders which are suspicious for any reason. This might include, for example, orders which pharmacists themselves flag as suspicious because they believe the orders are ultimately being diverted by prescribers who operate pill mills or by customers selling their prescription medication.

167.    In Store 147 in Denison, Texas, a pharmacy manager emailed the compliance unit with exactly these concerns, noting that a Texas prescriber was potentially running a pill mill and that the pill mill's patients were using Store 147's pharmacy to fill their invalid prescriptions. Walmart did not limit Store 147's orders or report any suspicious activity to the DEA.

168.    In the same vein, from July 2013 to July 2015, prior to the Relevant Period, Walmart pharmacies in North Carolina submitted more than seventy refusal-to-fill forms specifically identifying a North Carolina prescriber as issuing prescriptions which lacked legitimate medical purposes and identifying red flags associated with the prescriber, his patients, and his prescriptions. In the words of a pharmacist from Store 3825 in Havelock, North Carolina, written on a refusal-to-fill form, the prescriber "only writes for large qty of narcotic medications." The day after that form was filed, a pharmacist in Store 3864 in Jacksonville, North Carolina wrote, on a refusal-to-fill form, the following about this same prescriber's opioid prescription: "[W]ritten by a doctor that is known to give large quantities of c2 [Schedule II] prescriptions and no other

ones." (Original emphasis removed.) Later, in Grantsboro, North Carolina at Store 7238, a pharmacist rejected one of this prescriber's patients, writing on the refusal-to-fill form that the patient "appeared intoxicated (slurred speech [sic], unstable, glossy eyes)" and that the "prescription [was] written for [a] large quantity." (Original emphasis removed.)

169.    Walmart did nothing to limit shipments to Stores 3825, 3864, or 7238, or to other affected North Carolina Walmart pharmacies nor did it report any suspicious shipments to the DEA, despite having ample warning from its own pharmacists regarding the circumstances which made these orders suspicious.

170.    In Florida, Walmart pharmacies submitted numerous refusal-to-fill forms stemming from a Tampa-based physician whose patients travelled great distances to fill their prescriptions, a red flag which can indicate a pill mill. Store 959 in Bushnell, Florida, fifty-five outside Tampa, filled more of these prescriptions than any other Walmart, and also filed numerous refusal-to-fill forms, with one of its pharmacists writing "prescriber questionable."

171.    This prescriber did receive increased scrutiny. In June 2016, during the Relevant Period, Walmart's Director of Controlled Substances alerted Walmart's Regional Health and Wellness Director for Florida, Alabama, Mississippi, and Georgia that this prescriber was in the top three oxycodone 30 mg prescribers at Tampa Store 5654. Moreover, 75% of this prescriber's oxycodone 30 mg prescriptions were for 120 or more doses, and his three most popular prescriptions were oxycodone 30 mg, hydromorphone 8 mg, and methadone 10 mg—all opioids. In August 2016, Walmart's Director of Controlled Substances informed Walmart compliance employees that this prescriber was the top oxycodone 30 mg prescriber at Store 5964—also in Tampa—and that his prescriptions constituted 14% of the store's oxycodone 30 mg prescriptions.

172.    Walmart did not limit shipments to any affected stores, nor did it report any suspicious orders to the DEA. This includes to Stores 959, 5654, and 5954, where pharmacists themselves were raising red flags about their opioid dispensing, and where, at Store 5954, Walmart knew that one pill mill prescriber was diverting 14% of the store's oxycodone 30 mg.

### Walmart Did Not Regularly Investigate Flagged Orders Nor Did It Report Orders It Could Not Resolve

173.    Under Walmart's suspicious order monitoring program, as discussed above, orders of more than twenty bottles of Schedule II drugs, more than fifty bottles of Schedule III drugs, or orders which represented 30% increases against a four-week average became flagged as potentially suspicious. Walmart's own Revised Policy 21-402 required flagged orders to be held until compliance staff could determine whether the order was suspicious. This understanding was reiterated by a Walmart Senior Manager for Logistics in an August 27, 2014 email stating: "Our obligation is to monitor all orders, investigate 'orders of interest' (potentially 'suspicious' orders), hold any 'order of interest' until/unless the order is investigated and cleared and report any 'suspicious' order to DEA."

174.    This was not followed in practice. Walmart's suspicious order monitoring program produced so-called "Over 20" reports, which flagged orders of over twenty bottles of Schedule II controlled substances. These orders were referred to internally as "orders of interest" to differentiate them from the more serious "suspicious orders." However, repeatedly, orders flagged by the Over 20 reports would not be followed up on by anybody; they were neither cleared nor escalated to suspicious orders and were not reported to the DEA.

175.    Walmart instead shipped all Schedule II orders so long as they were under fifty bottles, which was Walmart's Schedule III, IV, and V threshold not Walmart's Schedule II threshold. Most were shipped with inadequate investigation and some were shipped with no

investigation at all. From July 2013 to July 2015, at least 66,000 orders of Schedule II drugs were shipped by Walmart, which exceeded the twenty-bottle threshold, but which were fifty bottles or less.

176.    The problem was especially pronounced at Walmart's Rogers, Arkansas distribution center. This distribution center used an order fulfillment system called KNAPP, a different system than the Reddwerks system used by Walmart's other facilities. KNAPP had a design flaw such that individual orders of interest could not be held without placing all orders on hold in the system. To avoid this, the Rogers facility regularly just shipped flagged orders without reviewing them in order to avoid logistical hurdles.

177.    In an August 25, 2014 email, a Walmart Senior Manager for Logistics acknowledged that employees were "uncomfortable with [Walmart's] inability to find a systemic or manual solution that would allow us to 'hold' orders pending evaluation," and further acknowledge that compliance staff "would prefer to move all of the Control drug business out of [the Rogers, Arkansas distribution center] and to McKesson [Corporation] until the KNAPP solution is in place." This move to McKesson Corporation ("McKesson")—a third-party drug distributor which some Walmart pharmacies used on occasion to fill certain orders—did not occur, and Walmart continued using the Rogers facility and its flawed KNAPP system despite their acknowledgement of its shortcomings.

178.    Walmart's "Overview of SOM Project Progress" stated that the Rogers, Arkansas distribution center "had very limited ability to monitor orders – KNAPP does not include monitoring functionality" and continued that KNAPP "did not allow alerted order to be 'held' pending evaluation."

179.    Thus, Walmart regularly shipped suspicious order because it was unwilling or unable to place them on hold while using the KNAPP system. Without a hold, Walmart could not and did not adequately review these orders and either way it did not report them to the DEA. The Rogers facility reported zero suspicious orders even as reports of its deficiencies were circulating internally.

### *Walmart Fails to Remedy Its Deeply Flawed Detection and Reporting System*

180.    As described above, Walmart was aware of the numerous problems with its suspicious order monitoring program, including its Reddwerks and KNAPP systems, and the need to remedy them. Walmart employed Mu Sigma, a corporate consulting firm, to review a modification it had designed that would use a statistical methodology to replace its bottle-limit thresholds currently used by Reddwerks.

181.    The results of this review were not to Walmart's liking. In January 2014, Mu Sigma reported that even the statistical methodology would be unable to detect suspicious patterns over time and utilized universal minimum thresholds which would prove ineffective. Mu Sigma offered its own methodology which addressed these shortcomings. Walmart rejected Mu Sigma's offer citing, in part, cost, despite the Company's operating profit of approximately $27 billion that year.

182.    Around August 2015, Walmart deployed the new statistical methodology which its own hired consultant, Mu Sigma, had identified problems with. This system remained in place through November 29, 2017, *i.e.*, into the Relevant Period, despite its flaws being known even before it was deployed.

### *Walmart Fails to Remedy Its New, Flawed Detection and Reporting System*

183.    As modified, Walmart's suspicious order monitoring program still failed to detect certain suspicious orders, like those of exhibiting a suspicious frequency or pattern, and even with

the new system Walmart failed to report suspicious orders to the DEA. Moreover, the new system did nothing to address Walmart's practice of ignoring known red flags raised by its pharmacists.

184.   In addition, Walmart's new system did not address the loophole which allowed pharmacies to circumvent limits and the suspicious order monitoring program by ordering substantially the same product using different National Drug Codes ("NDCs"). Using different NDCs, essentially the same drug could be ordered well in excess of established limits simply by buying different versions of the same product made by different manufacturers. Moreover, the new system still did not account for orders placed with third-party distributors, which meant that hundreds of thousands of orders Schedule III, IV, and V Controlled Substances could not be properly evaluated, either standing alone or in combination with a given pharmacy's other orders.

185.   At Sam's Club pharmacies in particular, Walmart still had very little effective detection and reporting mechanisms in place, thanks to Sam's Club pharmacies placing many orders directly with AmerisourceBergen Corporation—a third-party distributor. In November 2015, one pharmacist working at a Sam's Club pharmacy requested an increase in their permitted order size with AmerisourceBergen without consulting Walmart's compliance unit. A Walmart Director of Controlled Substances admitted in a December 2015 email that Sam's Club pharmacies' interfacing directly with AmerisourceBergen hampered the Company's "visibility into Sam's from a SOM [suspicious order monitoring] standpoint."

186.   Walmart-brand pharmacies were not models of transparency themselves, given their practice of, in some instances, interfacing with McKesson, without the compliance unit's input, to fill orders. This was still occurring as late as May 3, 2017, during the Relevant Period, when a Walmart Director of Controlled Substances wrote of a forthcoming attempt by the Company to "reduce the number of orders going directly to McKesson from the pharmacy. Those

direct to McKesson orders limit our ability to get full visibility to what pharmacies order and this project will be very helpful to us."

### Walmart's Reddwerks System, Even as Modified, Failed to Report Unusually Large Orders

187.    As discussed above, part of the changes to Walmart's suspicious order monitoring program involved changing how the Reddwerks systems flagged orders of interest. In 2015, Walmart switched from its universal twenty- and fifty-bottle triggering limits to using a statistical methodology which utilized individualized weekly limits unique to each pharmacy and unique to each drug the pharmacy carried.

188.    However, this statistical methodology was itself flawed, and thus failed to detect suspicious orders in all but the most flagrant of cases. Each pharmacy had each of its drug order histories analyzed, and any new drug order which exceeded three standard deviations from an average value would be flagged. However, pharmacies which usually placed large orders used a store-specific average—a comparatively high number—while pharmacies which usually placed smaller orders used an average derived from all Walmart pharmacies—a number which would typically be greater than the given pharmacy's actual average. This approach, as Mu Sigma pointed out, failed to detect unusually large orders unless they were egregiously large.

189.    Making matters worse, Walmart chose as its initial averaging period a 52-week time frame which began after the onset of the national opioid epidemic. Thus, the averages themselves reflected unusually large orders made while opioid use was at historic highs. Moreover, by using an averaging period during which Walmart pharmacies were not adequately detecting and reporting suspicious orders, including orders which were suspicious due to their unusually large size, Walmart was incorporating into its model drug order numbers which were higher than they would have been if Walmart had been in compliance with the law prior to the adoption of the

modified Reddwerks system. For these reasons, Walmart's new Reddwerks thresholds were artificially inflated by Walmart's illegal conduct to this point, severely compromising the Company's ability to detect new unusually large orders and resulting in Walmart failing to report even more suspicious orders.

190.    In addition, the modified Reddwerks system would not flag any drug unless a pharmacy was ordering more than 2,000 doses of it in a week. This universal minimum had to be overcome before the inflated average plus three standards of deviation value was even triggered. This universal minimum was arbitrarily set by Walmart, did not take into account the size of the pharmacy, and did not take into account whether, for example, a given drug's average order size was below 2,000 doses per week.

191.    These were not academic questions. For many Walmart pharmacies in smaller markets, a 2,000-dose minimum basically rendered the detection system useless for numerous controlled substances. For those pharmacies, whose average order size for most drugs would be less than 2,000 doses, their unusually large orders just could not trigger the Reddwerks detection system. As a quick hypothetical example, a pharmacy which averaged 300 doses of oxycodone 30 mg a week, might all of the sudden order 1,800 doses—six times its average and well above its average plus even a generous three standards of deviation—and this would not be considered unusually large under the modified Reddwerks system.

192.    Thus, for smaller pharmacies in particular, Walmart's modified system failed to detect unusually large orders and failed to report them to the DEA, prior to and during the Relevant Period.

*Walmart Continued Employing Certain Tactics to Justify Not Reporting Other Unusually Large Orders*

193.    From August 2015 to November 2017, including during the Relevant Period, Walmart continued to justify not reporting certain unusually large orders to the DEA, even with the modified suspicious order monitoring program in place.

194.    Walmart continued to regularly reduce shipments which were so large as to be flagged by Walmart's system, then ship the reduced order without reporting the initial, unusually large order, to the DEA. During four separate weeks in fall 2015, Walmart did this to over fifty shipments without reporting their initial orders to the DEA.

195.    On other occasions, Walmart would refuse to ship unusually large orders at all. Even then, Walmart would not report the orders to the DEA. During four separate weeks in fall 2015, Walmart reduced the size of more than thirty orders down to zero, thus refusing to send them, and even for those orders Walmart did not file suspicious-order reports with the DEA. Upon information and belief, Walmart reduced more orders to zero without reporting them to the DEA at least until November 29, 2017.

196.    In some cases, when Walmart would receive initial orders which would be flagged due to their size, the order would be reduced to the maximum amount which would not be flagged by Walmart's system. That is, in response to a suspicious order that was too large to ship without reporting to the DEA, Walmart would still send the most drugs it could while staying in nominal compliance with its own limits. This action was typically not coupled with any investigation nor was it reported to the DEA.

197.    On September 24, 2015, Store 3633 in Waynesboro, Pennsylvania ordered twelve bottles of buprenorphine HCL 8 mg, which was flagged. Following up, compliance personnel in Bentonville, Arkansas called the Waynesboro, Pennsylvania location and were informed that the

pharmacy "just wanted to receive the weekly threshold. That same day, the order was simply reduced by one bottle, to eleven. The initial order was not reported to the DEA as suspicious, despite compliance personnel calling the store to inquire about it, and the "reason code" input into Reddwerks to justify the reduction was "Error-System(POS)."

198.    On September 25, 2015, the very next day, the same store—Store 3633 in Waynesboro, Pennsylvania—tried to order two additional bottles of buprenorphine HCL 8 mg. This action was flagged and compliance personnel in Bentonville, Arkansas reduced that order to zero. Even then, this order was not reported to the DEA and the "reason code" input into Reddwerks to justify the reduction was again "Error-System(POS)."

199.    Also on September 25, 2015, Store 2281 in West Mifflin, Pennsylvania ordered nine bottles of buprenorphine HCL 8 mg. This order was also flagged and compliance personnel in Bentonville, Arkansas reviewed it and called the store. Again, they were informed that the pharmacy "would only like to receive the weekly threshold amount." That same day, Walmart reduced the order to four bottles. Walmart did not report the order to the DEA and the "reason code" input into Reddwerks to justify the reduction was again "Error-System(POS)."

200.    On other orders during this time, Walmart would justify reductions on initial order with the words "error" and "mistake" with no further elaboration as to what error or mistake was made which justified a reduction without a report to the DEA.

### Walmart Ignored Its Own Remediation Plans

201.    Even as Walmart undertook so many practices to avoid reporting many suspicious orders to the DEA, on occasion it did in fact file suspicious-order reports as required. Following this, Walmart would sometimes place the pharmacy at issue on a "remediation plan," nominally to prevent recurrence of the issues which led to the suspicious-order report. This would include

limiting the quantity of the particular drug which had led to the filing of the suspicious order report. In these cases, Walmart would impose a pharmacy-specific hard limit, intended to last for approximately one to two months.

202.    Walmart distribution centers regularly disregarded hard limits implemented in line with these remediation plans. Store 2530 in Rutland, Vermont was put on a two-month remediation plan after a March 2, 2017 suspicious order of twenty-three bottles of buprenorphine HCL 8 mg, which brought the store's total for that week to sixty-five bottles. As part of the store's remediation plan, it was put under a hard limit of fifty bottles of buprenorphine HCL 8 mg to last until May 5, 2017. In two separate weeks while operating under the remediation plan, Walmart distributed seventy-one and sixty-seven bottles to Store 2530, and neither of these incidents was reported to the DEA.

203.    Not only did Store 2530 receive shipments in excess of its hard limit directly from Walmart's distribution system during its remediation plan, but it also, on two further occasions, received shipments in excess of its weekly limit by using both Walmart and McKesson. In one week in April 2017, Store 2530 received fifty bottles from Walmart and two additional bottles from McKesson, thus evading the hard limit of the remediation plan. In the final week of the remediation plan, in May 2017, Store 2530 received fifty bottles from Walmart and ***106 bottles*** from McKesson, for a weekly total of 156—three times the hard limit.

204.    Store 130 in Muskogee, Oklahoma, was put on a remediation plan—lasting from August 25, 2017 to October 20, 2017—following an August 23, 2017 suspicious order of forty-two bottles of hydrocodone-acetaminophen 10/325 mg which brought the store's weekly total to seventy-nine bottles. The hard limit imposed under this remediation plan was fifty bottles of hydrocodone-acetaminophen 10/325 mg a week. In one week during the remediation period,

Walmart shipped sixty-one bottles to the store, well above the limit, and did not report this to the DEA.

### *Walmart Reported A Tiny Fraction of Its Orders*

205.    Walmart shipped about 15.2 million orders of Schedule II controlled substances and Schedule III narcotics to its pharmacies from June 26, 2013 through November 29, 2017, which does not include non-narcotic Schedule III controlled substances, any Schedule IV and V controlled substances, or any third-party distributor shipments. During the same period, Walmart sent about 37.5 million orders to its pharmacies of all Schedule II, III, IV, and V controlled substances. In all this time, Walmart reported 204 suspicious order to the DEA, or about half of one thousandth of one percentage point.

206.    During this same time frame, one of Walmart's third-party distributors, McKesson, which made fewer shipments to Walmart pharmacies than Walmart itself did, reported over 13,000 suspicious orders placed by Walmart pharmacies to the DEA.

207.    Walmart failed to report suspicious orders because Walmart failed to maintain an adequate system to detect suspicious orders and because Walmart went to great lengths to justify resolving suspicious orders without reporting them, such as by reducing the quantity of suspicious orders and relabeling them as "errors" without also reporting them to the DEA. Walmart's failure to have an adequate detection system was itself a violation of 21 C.F.R § 1301.74(b), which requires that a suspicious order monitoring system "disclose to the registrant suspicious orders of controlled substances."

208.    Walmart's noncompliance with its obligation to have an adequate detection system exacerbated Walmart's noncompliance with its obligations to detect and report suspicious orders, because it prevented Walmart from, in the first place, being able to effectively find and investigate

potentially, and actually, suspicious orders and then to take appropriate responsive measures. As a result, hundreds of thousands of suspicious orders, if not more, were not detected, not reported, and not remediated.

209.    In some cases, even where Walmart did identify suspicious orders, the Company shipped them anyway without also reporting the orders or taking further remedial action. A Senior Manager for Logistics wrote in an August 20, 2014 email that, "[t]he alternative to pulling the order back is simply to continue to follow the process we have today. We can add further evaluation of orders after shipment but, if we see an issue that suggests that product shouldn't have been shipped, we just leave it at the store and let it enter the market. Given the choices, [having the store] ship . . . the product back feels like the more socially responsible approach, but the [distribution center] will do whatever leadership wants them to do."

### The Individual Defendants' Knowledge

210.    The Board was aware of Walmart's compliance problems at least as early as March 2011, when the Company entered into the MOA with the DEA requiring that the Company implement, *inter alia*, an adequate compliance program. Still, as described above in great, this did not happen, with Walmart's compliance program remaining inadequate after the MOA was entered into, including after Walmart made modifications to the program.

211.    A letter to the DOJ written by Jones Day on behalf of Walmart, dated September 27, 2019—during the Relevant Period—recognized that Walmart had been under DOJ investigation for CSA violations for almost three years, with the Company having already produced approximately one million pages of documents and records pertaining to six million prescriptions. The letter further acknowledge that a former compliance employee of Walmart was threatened with indictment in Texas, that Walmart itself had been threatened with indictment by

the DOJ, and that Walmart was under a tolling agreement with the DOJ set to expire on October 25, 2019.

212.     In addition, Walmart had been under DEA investigation, since at least December 7, 2016, after first receiving five subpoenas with which it had complied. Walmart had ongoing contacts with federal prosecutors in Texas in connection to the case.

213.     The Individual Defendants, as controlling shareholders, directors, and officers of Walmart must have been aware of these ongoing enforcement and possible enforcement actions, and the underlying conduct, which was the cause of these actions, yet they still made and or/caused the Company to make the false and misleading statements, in breach of their fiduciary duties.

**False and Misleading Statements**

***March 30, 2016 Annual Report***

214.     On March 30, 2016, the Company filed its annual report for Fiscal Year 2016 on Form 10-K with the SEC (the "2016 10-K"). It was signed by, *inter alia*, Defendants McMillon, Penner, Biggs, Flynn, Horton, Mayer, Reinemund, and R. Walton and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McMillon and Biggs attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

215.     In the 2016 10-K, the Company reported that 11% of its total sales of merchandise from its Walmart U.S. division were "Health and Wellness" sales, including the pharmacy business. The 2016 10-K failed to disclose, *inter alia*, that the amount of these sales was artificially inflated because of the amount of prescriptions Walmart was illegally filling.

216.     The 2016 10-K also contained the following statement regarding the Company's internal controls, touting their efficacy despite the omission of known, material facts:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information, which is required to be timely disclosed, is accumulated and communicated to management in a timely fashion. In designing and evaluating such controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management is necessarily required to use judgment in evaluating controls and procedures. Also, we have investments in unconsolidated entities. Since we do not control or manage those entities, our controls and procedures with respect to those entities are substantially more limited than those we maintain with respect to our consolidated subsidiaries.

In the ordinary course of business, we review our internal control over financial reporting and make changes to our systems and processes to improve such controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, updating existing systems, automating manual processes, migrating certain processes to our shared services organizations and increasing monitoring controls. These changes have not materially affected, and are not reasonably likely to materially affect, the Company's internal control over financial reporting. However, they allow us to continue to enhance our internal control over financial reporting and ensure that our internal control environment remains effective.

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report was performed under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

***March 31, 2017 Annual Report***

217.    On March 31, 2017, the Company filed the 2017 10-K with the SEC. It was signed, *inter alia*, by Defendants McMillon, Penner, Biggs, Flynn, Horton, Mayer, Reinemund, R. Walton, and S. Walton and contained SOX certifications signed by Defendants McMillon and Biggs

attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

218. In the 2017 10-K, the Company reported that 11% of its total sales of merchandise from its Walmart U.S. division were "Health and Wellness" sales, including the pharmacy business, while failing to disclose, *inter alia*, that the amount of these sales was artificially inflated because of the amount of prescriptions Walmart was illegally filling.

219. The 2017 10-K also contained the following statement regarding the general risks the Company faced due to its pharmacy business, notably omitting any mention of specific risks the Company faced for its known, pervasive lack of legal compliance in this business segment:

> The retail pharmacy operations in our Walmart U.S. and Sam's Club segments generate substantial net sales, a large majority of which are generated by filling prescriptions for which we receive payment established through contractual relationship with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").
>
> Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burden associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation among third party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs

prescribed for them to the extent the costs are not reimbursed by a third party; failure to meet any performance or incentive thresholds to which our level of third party reimbursement may be subject; and changes in the regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.

If the supply of certain pharmaceuticals provided by one or more of vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations, result in the loss of cross-store or -club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

220.    The 2017 10-K also contained the following statement regarding the Company's

internal controls, touting their efficacy despite the omission of known, material facts:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information, which is required to be timely disclosed, is accumulated and communicated to management in a timely fashion. In designing and evaluating such controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management is necessarily required to use judgment in evaluating controls and procedures. Also, we have investments in unconsolidated entities. Since we do not control or manage those entities, our controls and procedures with respect to those entities are substantially more limited than those we maintain with respect to our consolidated subsidiaries.

In the ordinary course of business, we review our internal control over financial reporting and make changes to our systems and processes to improve such controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, updating existing systems, automating manual processes, migrating certain processes to our shared services organizations and increasing monitoring controls. These changes have not materially affected, and are not reasonably likely to materially affect, the Company's internal control over financial

reporting. However, they allow us to continue to enhance our internal control over financial reporting and ensure that our internal control environment remains effective.

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report was performed under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

### *March 30, 2018 Annual Report*

221.    On March 30, 2018 filed its annual report for Fiscal Year 2018 on Form 10-K with the SEC (the "2018 10-K"). The 2018 10-K was signed, *inter alia*, by Defendants McMillon, Penner, Biggs, Flynn, Friar, Harris, Horton, Mayer, Reinemund, R. Walton, and S. Walton and contained SOX certifications signed by Defendants McMillon and Biggs attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

222.    In the 2018 10-K, the Company reported that 11% of its total sales of merchandise from its Walmart U.S. division were "Health and Wellness" sales, including the pharmacy busines, while failing to disclose, *inter alia*, that the amount of these sales was artificially inflated because of the amount of prescriptions Walmart was illegally filling.

223.    The 2018 10-K contained the following general statement regarding risks the Company faced due to its pharmacy business, notably omitting any mention of the specific risks the Company faced for its known, pervasive lack of legal compliance in this business segment:

> Walmart has retail pharmacy operations in our Walmart U.S. and Sam's Club segments and a large majority of the retail pharmacy net sales are generated by filling prescriptions for which we receive payment through established contractual relationships with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").
>
> Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burdens associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation among third party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third party; failure to meet any performance or incentive thresholds to which our level of third party reimbursement may be subject; and changes in the regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.
>
> If the supply of certain pharmaceuticals provided by one or more of our vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result

in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations, result in the loss of cross-store or cross-club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

224.    The 2018 10-K further described the regulatory environment the Company operated in, again without discussing the specific, existing, and known problems the Company had in complying with these regulations:

We operate in complex regulated environments in the United States and in the other countries in which we operate and could be adversely affected by changes to existing legal requirements including the related interpretations and enforcement practices, new legal requirements and/or any failure to comply with applicable regulations. Our pharmacy operations in the United States are subject to numerous federal, state and local regulations including licensing and other requirements for pharmacies and reimbursement arrangements. The regulations to which we are subject include, but are not limited to: federal and state registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine; applicable governmental payer regulations including Medicare and Medicaid; data privacy and security laws and regulations including the Health Insurance Portability and Accountability Act, the Affordable Care Act or any successor thereto; laws and regulations relating to the protection of the environment and health and safety matters, including those governing exposure to, and the management and disposal of, hazardous substances; regulations regarding food and drug safety including those of the U.S. Food and Drug Administration (the "FDA") and the Drug Enforcement Administration (the "DEA"), trade regulations including those of the U.S. Federal Trade Commission, and consumer protection and safety regulations including those of the Consumer Product Safety Commission, as well as state regulatory authorities, governing the availability, sale, advertisement and promotion of products we sell and the financial services we offer; anti-kickback laws; false claims laws; and federal and state laws governing health care fraud and abuse and the practice of the professions of pharmacy, optical care and nurse practitioner services.

For example, in the United States the DEA and various other regulatory authorities regulate the distribution and dispensing of pharmaceuticals and controlled substances. We are required to hold valid DEA and state-level licenses, meet various security and operating standards and comply with the federal and various state controlled substance acts and related regulations governing the sale,

dispensing, disposal, holding and distribution of controlled substances. The DEA, FDA and state regulatory authorities have broad enforcement powers, including the ability to seize or recall products and impose significant criminal, civil and administrative sanctions for violations of these laws and regulations. We are also governed by foreign, national and state laws of general applicability, including laws regulating matters of working conditions, health and safety and equal employment opportunity and other labor and employment matters, as well as employee benefit, competition, anti-money laundering, antitrust matters and health and wellness related regulations for our pharmacy operations outside of the United States. Changes in laws, regulations and policies and the related interpretations and enforcement practices may alter the landscape in which we do business and may significantly affect our cost of doing business.

The impact of new laws, regulations and policies and the related interpretations and enforcement practices generally cannot be predicted, and changes in applicable laws, regulations and policies and the related interpretations and enforcement practices may require extensive system and operational changes, be difficult to implement, increase our operating costs and require significant capital expenditures. Untimely compliance or noncompliance with applicable laws and regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our businesses, including: suspension of payments from government programs; loss of required government certifications; loss of authorizations to participate in or exclusion from government programs, including the Medicare and Medicaid programs in the United States; loss of licenses; and significant fines or monetary damages and/or penalties. Any failure to comply with applicable regulatory requirements in the United States or in any of the countries in which we operate could result in significant legal and financial exposure, damage our reputation, and have a material adverse effect on our business operations, financial condition and results of operations.

225.     The 2018 10-K also contained the following statement regarding the Company's

internal controls, touting their efficacy despite the omission of known, material facts:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information, which is required to be timely disclosed, is accumulated and communicated to management in a timely fashion. In designing and evaluating such controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management is necessarily required to use judgment in evaluating controls and procedures. Also, we have investments in unconsolidated entities. Since we do not control or manage those entities, our controls and procedures with respect to those entities are substantially more limited than those we maintain with respect to our consolidated subsidiaries.

In the ordinary course of business, we review our internal control over financial reporting and make changes to our systems and processes to improve such controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, updating existing systems, automating manual processes, migrating certain processes to our shared services organizations and increasing monitoring controls. These changes have not materially affected, and are not reasonably likely to materially affect, the Company's internal control over financial reporting. However, they allow us to continue to enhance our internal control over financial reporting and ensure that our internal control environment remains effective.

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report was performed under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

### March 28, 2019 Annual Report

226.    On March 28, 2019, the Company filed its annual report for Fiscal Year 2019 on Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K was signed, *inter alia*, by Defendants McMillon, Penner, Biggs, Flynn, Friar, Harris, Horton, Mayer, Reinemund, R. Walton, and S. Walton and contained SOX certifications signed by Defendants McMillon and Biggs attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

227.    In the 2019 10-K, the Company reported that about $35.8 billion of its merchandise sales—about 10.8% of total sales—from its Walmart U.S. division were "Health and Wellness"

sales, including the pharmacy busines, while failing to disclose, *inter alia*, that the amount of these sales was artificially inflated because of the amount of prescriptions Walmart was illegally filling.

228.   The 2019 10-K contained the following general statement regarding risks the Company faced due to its pharmacy business, notably omitting any mention of the specific risks the Company faced for its known, pervasive lack of legal compliance in this business segment:

> Walmart has retail pharmacy operations in our Walmart U.S. and Sam's Club segments. A large majority of our retail pharmacy net sales are generated by filling prescriptions for which we receive payment through established contractual relationships with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").
>
> Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burdens associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation among third party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third party; failure to meet any performance or incentive thresholds to which our level of third party reimbursement may be subject; and changes in the regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.

If the supply of certain pharmaceuticals provided by one or more of our vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations or result in the loss of cross-store or cross-club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

229.    The 2019 10-K further described the regulatory environment the Company operated

in, again without discussing the specific, existing, and known problems the Company had in

complying with these regulations:

We operate in complex regulated environments in the United States and in the other countries in which we operate and could be adversely affected by changes to existing legal requirements including the related interpretations and enforcement practices, new legal requirements and/or any failure to comply with applicable regulations.

Our pharmacy operations in the United States are subject to numerous federal, state and local regulations including licensing and other requirements for pharmacies and reimbursement arrangements. The regulations to which we are subject include, but are not limited to: federal and state registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine; applicable governmental payer regulations including Medicare and Medicaid; data privacy and security laws and regulations including the Health Insurance Portability and Accountability Act, the Affordable Care Act, laws and regulations relating to the protection of the environment and health and safety matters, including those governing exposure to, and the management and disposal of, hazardous substances; regulations regarding food and drug safety including those of the U.S. Food and Drug Administration (the "FDA") and the Drug Enforcement Administration (the "DEA"), trade regulations including those of the U.S. Federal Trade Commission, and consumer protection and safety regulations including those of the Consumer Product Safety Commission, as well as state regulatory authorities, governing the availability, sale, advertisement and promotion of products we sell and the financial services we offer; anti-kickback laws; false claims laws; and federal and state laws governing health care fraud and abuse and the practice of the professions of pharmacy, optical care and nurse practitioner services.

For example, in the United States the DEA and various other regulatory authorities regulate the distribution and dispensing of pharmaceuticals and controlled substances. We are required to hold valid DEA and state-level licenses, meet various security and operating standards and comply with the federal and various state controlled substance acts and related regulations governing the sale, dispensing, disposal and holding of controlled substances. The DEA, the FDA and state regulatory authorities have broad enforcement powers, including the ability to seize or recall products and impose significant criminal, civil and administrative sanctions for violations of these laws and regulations.

We are also governed by foreign, national and state laws and regulations of general applicability, including laws and regulations related to working conditions, health and safety, equal employment opportunity, employee benefit and other labor and employment matters, laws and regulations related to competition, and antitrust matters, and health and wellness related regulations for our pharmacy operations outside of the United States. In addition, certain financial services we offer or make available, such as our money transfer agent services, are subject to legal and regulatory requirements, including those intended to help detect and prevent money laundering, fraud and other illicit activity. The impact of new laws, regulations and policies and the related interpretations and changes in enforcement practices or regulatory scrutiny generally cannot be predicted, and changes in applicable laws, regulations and policies and the related interpretations and enforcement practices may require extensive system and operational changes, be difficult to implement, increase our operating costs, require significant capital expenditures, or adversely impact the cost or attractiveness of the products or services we offer.

Untimely compliance or noncompliance with applicable laws and regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our businesses, including: suspension of payments from government programs; loss of required government certifications; loss of authorizations to participate in or exclusion from government programs, including the Medicare and Medicaid programs in the United States; loss of licenses; and significant fines or monetary damages and/or penalties. In addition, failure to comply with applicable legal or regulatory requirements in the United States or in any of the countries in which we operate could result in significant legal and financial exposure, damage to our reputation, and have a material adverse effect on our business operations, financial condition and results of operations.

230.   The 2019 10-K also contained the following statement regarding the Company's

internal controls, touting their efficacy despite the omission of known, material facts:

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information, which is required to be timely disclosed, is accumulated and communicated to management in a timely fashion. In designing

and evaluating such controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management is necessarily required to use judgment in evaluating controls and procedures. Also, we have investments in unconsolidated entities. Since we do not control or manage those entities, our controls and procedures with respect to those entities are substantially more limited than those we maintain with respect to our consolidated subsidiaries.

In the ordinary course of business, we review our internal control over financial reporting and make changes to our systems and processes to improve such controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, updating existing systems, automating manual processes, standardizing controls globally, migrating certain processes to our shared services organizations and increasing monitoring controls. During fiscal 2019, we announced an agreement to outsource select accounting transaction-processing activities which is part of an ongoing initiative to enhance our shared service model. These changes have not materially affected, and are not reasonably likely to materially affect, the Company's internal control over financial reporting. However, they allow us to continue to enhance our internal control over financial reporting and ensure that our internal control environment remains effective.

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report was performed under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

### March 20, 2020 Annual Report

231.    On March 20, 2020, the Company filed its annual report on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants McMillon, Penner, Biggs, Conde, Flynn, Friar, Harris, Horton, Mayer, Reinemund, R. Walton, and S. Walton and contained SOX certifications signed by Defendants McMillon and Biggs attesting to the accuracy of the

financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

232.     In the 2020 10-K, the Company reported that about $37.5 billion of its merchandise sales—about 11.0% of total sales—from its Walmart U.S. division were "Health and Wellness" sales, including the pharmacy busines, while failing to disclose, *inter alia*, that the amount of these sales was artificially inflated because of the amount of prescriptions Walmart was illegally filling.

233.     The 2020 10-K contained the following general statement regarding risks the Company faced due to its pharmacy business, notably omitting any mention of the known, specific risks the Company faced for its pervasive lack of legal compliance in this business segment:

> Walmart has retail pharmacy operations in our Walmart U.S. and Sam's Club segments, as well as the recent addition of Walmart Health Centers to some of our U.S. stores. A large majority of our retail pharmacy net sales are generated by filling prescriptions for which we receive payment through established contractual relationships with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs").

> Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third-party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burdens associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations; further consolidation and strategic alliances among third-party payers, PBMs or purchasers

of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third-party; failure to meet any performance or incentive thresholds to which our level of third-party reimbursement may be subject; and changes in the regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of restrictions on the further implementation of or the repeal of the Patient Protection and Affordable Care Act or the enactment and implementation of a law replacing such act, and other changes in laws, rules and regulations that affect our retail pharmacy business.

If the supply of certain pharmaceuticals provided by one or more of our vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

One or a combination of such factors may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations or result in the loss of cross-store or cross-club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

234.    The 2020 10-K further described the regulatory environment the Company operated in, again without discussing the specific, existing, and known problems the Company had in complying with these regulations:

We operate in complex regulated environments in the U.S. and in the other countries in which we operate and could be adversely affected by changes to existing legal requirements including the related interpretations and enforcement practices, new legal requirements and/or any failure to comply with applicable regulations.

Our pharmacy and other healthcare operations in the U.S. are subject to numerous federal, state and local regulations including licensing and other requirements and reimbursement arrangements. The regulations to which we are subject include, but are not limited to: federal and state registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine; applicable governmental payer regulations including Medicare and Medicaid; data privacy and security laws and regulations including the Health Insurance Portability and Accountability Act, the Affordable Care Act, laws and regulations relating to the protection of the environment and health and safety matters, including those governing exposure to, and the management and disposal

of, hazardous substances; regulations regarding food and drug safety including those of the U.S. Food and Drug Administration (the "FDA") and the Drug Enforcement Administration (the "DEA"), trade regulations including those of the U.S. Federal Trade Commission, and consumer protection and safety regulations including those of the Consumer Product Safety Commission, as well as state regulatory authorities, governing the availability, sale, advertisement and promotion of products we sell and the financial services we offer; anti-kickback laws; false claims laws; and federal and state laws governing health care fraud and abuse and the practice of the professions of pharmacy, optical care and nurse practitioner services.

For example, in the U.S. the DEA and various other regulatory authorities regulate the distribution and dispensing of pharmaceuticals and controlled substances. We are required to hold valid DEA and state-level licenses, meet various security and operating standards and comply with the federal and various state controlled substance acts and related regulations governing the sale, dispensing, disposal and holding of controlled substances. The DEA, the FDA and state regulatory authorities have broad enforcement powers, including the ability to seize or recall products and impose significant criminal, civil and administrative sanctions for violations of these laws and regulations.

We are also governed by foreign, national and state laws and regulations of general applicability, including laws and regulations related to working conditions, health and safety, equal employment opportunity, employee benefit and other labor and employment matters, laws and regulations related to competition, and antitrust matters, and health and wellness related regulations for our pharmacy operations outside of the U.S. In addition, certain financial services we offer or make available, such as our money transfer agent services, are subject to legal and regulatory requirements, including those intended to help detect and prevent money laundering, sanctions, fraud and other illicit activity as well as consumer financial protection. The impact of new laws, regulations and policies and the related interpretations, as well as changes in enforcement practices or regulatory scrutiny generally cannot be predicted, and changes in applicable laws, regulations and policies and the related interpretations and enforcement practices may require extensive system and operational changes, be difficult to implement, increase our operating costs, require significant capital expenditures, or adversely impact the cost or attractiveness of the products or services we offer.

Untimely compliance or noncompliance with applicable laws and regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our businesses, including: suspension of payments from government programs; loss of required government certifications; loss of authorizations to participate in or exclusion from government programs, including the Medicare and Medicaid programs in the U.S.; loss of licenses; and significant fines or monetary damages and/or penalties. In addition, failure to comply with applicable legal or regulatory requirements in the U.S. or in any of the countries in

which we operate could result in significant legal and financial exposure, damage to our reputation, and have a material adverse effect on our business operations, financial condition and results of operations.

235.    The 2020 10-K also contained the following statement regarding the Company's

internal controls, touting their efficacy despite the omission of known, material facts:

> We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information, which is required to be timely disclosed, is accumulated and communicated to management in a timely fashion. In designing and evaluating such controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management is necessarily required to use judgment in evaluating controls and procedures. Also, we have investments in unconsolidated entities. Since we do not control or manage those entities, our controls and procedures with respect to those entities are substantially more limited than those we maintain with respect to our consolidated subsidiaries.
>
> In the ordinary course of business, we review our internal control over financial reporting and make changes to our systems and processes to improve such controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, updating existing systems, automating manual processes, standardizing controls globally, migrating certain processes to our shared services organizations and increasing monitoring controls. These changes have not materially affected, and are not reasonably likely to materially affect, the Company's internal control over financial reporting. However, they allow us to continue to enhance our internal control over financial reporting and ensure that our internal control environment remains effective.
>
> An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report was performed under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

236.    The statements referenced in ¶¶ 214–235 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was filling prescriptions from physicians known to be over-prescribers, also called "pill mills;" (2) the Company filled prescriptions numbering in the thousands which had clear signs of illegality, including prescriptions of drugs which were extremely dangerous when used together; (3) Walmart's managers actively encouraged Walmart's pharmacists to abdicate their legal responsibilities and to fill as many prescription drug orders as they could, regardless of their validity; (4) Walmart's pharmacy revenue was artificially inflated because of the amount of prescriptions they were illegally filling; (5) Walmart did not maintain an adequate suspicious order monitoring program; (6) due to this, Walmart's distribution network failed to detect and report thousands of suspicious orders; (7) by illegally filling prescriptions and shipping suspicious orders in such great quantities, the Company was likely to, and did, become subject to enforcement action; and (8) the Company failed to maintain adequate internal controls. As a result of the foregoing, the statements at issue concerning the Company's business, operations, and prospects were materially false and misleading at all relevant times.

### April 23, 2020 Proxy Statement

237.    On April 23, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Conde, Flynn, Friar, Harris, Horton, Mayer, McMillon, Penner, Reinemund, R. Walton, and S. Walton solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.

238.     The 2020 Proxy Statement also called for Company shareholders to, *inter alia*: (1) elect eleven directors; (2) approve, in an advisory vote, the compensation of the Company's named executive officers; and (3) ratify the appointment of Ernst & Young LLP as Walmart's independent auditor.

239.     The 2020 Proxy Statement promoted certain "Corporate Governance Highlights" which the Board had accomplished, including "[r]obust stock ownership guidelines." However, Defendant R. Walton made insider sales for proceeds in excess of $995 million during the Relevant Period while the Company's shares were trading at artificially inflated prices.

240.     The 2020 Proxy Statement, in describing the Audit Committee's "Primary Responsibilities," states that the Audit Committee"[r]eviews risk assessment and risk management process and policies, processes and procedures regarding compliance with applicable law and regulations, as well as Global Statement of Ethics and Code of Ethics for the CEO and Senior Financial Officers"[4] and "[o]verses Walmart's global ethics and compliance program[.]" However, the Audit Committee was not performing this function as evidenced by there being no effective oversight over Defendant R. Walton's insider sales, no effective oversight over the Company's stock repurchase at inflated prices, no effective oversight over the Individual Defendant's noncompliance with the Company's Code of Conduct and Reporting Protocols for Senior Officials, and no effective internal controls.

---

Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.
[4] Effective February 1, 2021, Walmart renamed its "Global Statement Ethics" the "Code of Conduct," and renamed its "Code of Ethics for the CEO and Senior Financial Officers" the "Reporting Protocols for Senior Financial Officers." The relevant provisions of those documents are described above.

241.    The 2020 Proxy Statement, in describing the Nominating and Governance Committee's "Primary Responsibilities," that the Nominating and Governance Committee "[o]versees corporate governance issues and makes recommendations to the Board[.]" However, the Nominating and Governance Committee was not exercising this function as the Company's corporate governance was being ignored, leading to the issuance of false and misleading statements in the Company's SEC filings, insider sales, share repurchases at inflated prices, and failure to report the same.

242.    The 2020 Proxy Statement continued by stating:

> ***Walmart identifies, assesses, and assigns responsibility for managing risks through its annual enterprise risk assessment process, other internal processes, and internal control environment.*** The Board, Board committees, and management coordinate risk oversight and management responsibilities in a manner that we believe serves the long-term interests of our company and our shareholders through established periodic reporting and open lines of communication.

(Emphasis added.)

243.    However, the Board and the Board's committees had done little, if anything, to ensure the adequacy of the Company's internal controls, as evidenced by the continuing false and misleading statements issued in SEC filings throughout the Relevant Period.

244.    The 2020 Proxy Statement failed to disclose, *inter alia*, was that: (1) the Company was filling prescriptions from physicians known to be over-prescribers, also called "pill mills;" (2) the Company filled prescriptions numbering in the thousands which had clear signs of illegality, including prescriptions of drugs which were extremely dangerous when used together; (3) Walmart's managers actively encouraged Walmart's pharmacists to abdicate their legal responsibilities and to fill as many prescription drug orders as they could, regardless of their validity; (4) Walmart's pharmacy revenue was artificially inflated because of the amount of

prescriptions they were illegally filling; (5) Walmart did not maintain an adequate suspicious order monitoring program; (6) due to this, Walmart's distribution network failed to detect and report thousands of suspicious orders; (7) by illegally filling prescriptions and shipping suspicious orders in such great quantities, the Company was likely to, and did, become subject to enforcement action; and (8) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's 2020 Proxy Statement was materially false and misleading.

245.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*, re-elected Defendants Conde, Flynn, Friar, Harris, Horton, Mayer, McMillon, Penner, Reinemund, R. Walton, and S. Walton which allowed them to continue breaching their fiduciary duties to Walmart.

**The Truth Emerges**

***December 22, 2020 DOJ Press Release***

246.    On December 22, 2020, while markets were still open, the DOJ issued a press release announcing that it was filing a civil lawsuit against Walmart for CSA violations, stating in relevant part:

> In a civil complaint filed today, the Department of Justice has alleged that Walmart Inc. unlawfully dispensed controlled substances from pharmacies it operated across the country and unlawfully distributed controlled substances to those pharmacies throughout the height of the prescription opioid crisis.
>
> The complaint alleges that this unlawful conduct resulted in hundreds of thousands of violations of the Controlled Substances Act (CSA). The Justice Department seeks civil penalties, which could total in the billions of dollars, and injunctive relief.
>
> "It has been a priority of this administration to hold accountable those responsible for the prescription opioid crisis. As one of the largest pharmacy chains and wholesale drug distributors in the country, Walmart had the responsibility and the means to help prevent the diversion of prescription opioids," said Jeffrey Bossert Clark, Acting Assistant Attorney General of the Civil Division. "Instead, for years, it did the opposite — filling thousands of invalid prescriptions at its pharmacies and

failing to report suspicious orders of opioids and other drugs placed by those pharmacies. This unlawful conduct contributed to the epidemic of opioid abuse throughout the United States. Today's filing represents an important step in the effort to hold Walmart accountable for such conduct."

"We entrust distributors and dispensers with the responsibility to ensure controlled substances do not fall into the wrong hands," said Drug Enforcement Administration (DEA) Acting Administrator Timothy Shea. "When processes to safeguard against drug diversion are violated or ignored, or when pharmacies routinely fill illegitimate prescriptions, we will hold accountable anyone responsible, including Walmart. Too many lives have been lost because of oversight failures and those entrusted with responsibility turning a blind eye."

The result of a multi-year investigation by the department's Prescription Interdiction & Litigation (PIL) Task Force, the complaint filed in the U.S. District Court for the District of Delaware alleges that Walmart violated the CSA in multiple ways as the operator of its pharmacies and wholesale drug distribution centers. *The complaint alleges that, as the operator of its pharmacies, Walmart knowingly filled thousands of controlled substance prescriptions that were not issued for legitimate medical purposes or in the usual course of medical practice, and that it filled prescriptions outside the ordinary course of pharmacy practice. The complaint also alleges that, as the operator of its distribution centers, which ceased distributing controlled substances in 2018, Walmart received hundreds of thousands of suspicious orders that it failed to report as required to by the DEA.* Together, the complaint alleges, these actions helped to fuel the prescription opioid crisis.

*If Walmart is found liable for violating the CSA, it could face civil penalties of up to $67,627 for each unlawful prescription filled and $15,691 for each suspicious order not reported.* The court also may award injunctive relief to prevent Walmart from committing further CSA violations.

*"For years, Walmart failed to meet its obligations in distributing and dispensing dangerous opioids and other drugs,"* said Deputy Assistant Attorney General Daniel J. Feith of the Civil Division's Consumer Protection Branch. "We look forward to advancing this case with our DOJ partners."

"The opioid crisis has exacted a catastrophic human toll upon the residents of our district and upon our country," said U.S. Attorney for the Middle District of Florida Maria Chapa Lopez. *"National pharmacy chains must meet their legal obligations when dispensing and distributing these powerful medications.* The filing of this complaint in collaboration with the Department of Justice and other United States Attorneys' Offices demonstrates our firm commitment to enforcing these critical legal requirements."

> *"As a pharmacy that fills prescriptions for controlled substances, Walmart has an obligation to fill only those prescriptions that are legitimate,"* said Acting U.S. Attorney for the Eastern District of New York Seth D. DuCharme. *"As a wholesale drug distributor, Walmart also had an obligation to notify DEA of suspicious orders of controlled substances. Walmart failed to comply with both of its obligations,* and thereby failed in its responsibility to prevent the diversion of controlled substances."

> "Today's complaint is the culmination of a painstaking investigation by my office and *our Department of Justice colleagues that uncovered years of unlawful conduct that did untold damage to communities around the country,* including here in Colorado," said U.S. Attorney for the District of Colorado Jason R. Dunn. "We look forward to pursuing justice and holding the company accountable for its conduct."

(Emphasis added.)

247.    On this news, the price of the Company's common stock fell from $145.97 per share at close the day before, December 21, 2020, to end that day, December 22, 2020, at $144.20 per share.  The slide continued the next day, December 23, 2020, with the Company closing at $143.22. Thus, over the course of those two days, the Company's common stock fell $2.75 per share, or about 1.9%.

**<u>Repurchases</u>**

248.    During the Relevant Period, certain of the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $906 million to repurchase approximately 6,161,687 shares of its own common stock at artificially inflated prices.

249.    According to the 2021 10-K, from November 1, 2020 to November 30, 2020, the Company purchased 1,827,372 shares of its common stock for approximately $272,113,965, at an average price of $148.91 per share.

250.    As the Company's stock was actually worth only $143.22 per share, the price at closing on December 23, 2020, the Company overpaid by approximately $10,397,747 for repurchases of its own stock during November 2020.

251.    According to the 2021 10-K, from December 1, 2020 to December 31, 2020, the Company purchased 4,334,315 shares of its common stock for approximately $634,240,314, at an average price of $146.33 per share.

252.    As the Company's stock was actually worth only $143.22 per share, the price at closing on December 23, 2020, the Company overpaid by approximately $13,479,720 for repurchases of its own stock during December 2015.

253.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by almost $23.9 million.

## DAMAGES TO WALMART

254.    As a direct and proximate result of the Individual Defendants' conduct, Walmart will lose and expend many millions of dollars.

255.    Such losses include approximately $23.9 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

256.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection to those two actions.

257.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

258.     As a direct and proximate result of the Individual Defendants' conduct, Walmart has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

259.     Plaintiff brings this action derivatively and for the benefit of Walmart to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors. and/or officers of Walmart, waste of corporate assets, unjust enrichment, violations of Sections 14(a) of the Exchange Act, and the claims alleged in the Securities Class Action, as well as the aiding and abetting thereof.

260.     Walmart is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

261.     Plaintiff is, and has been at all relevant times, a shareholder of Walmart. Plaintiff will adequately and fairly represent the interests of Walmart in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

262.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

263.    A pre-suit demand on the Board of Walmart is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following twelve individuals: Defendants McMillon, Conde, Flynn, Friar, Harris, Horton, Mayer, Penner, Reinemund, R. Walton and S. Walton (the "Director-Defendants"), along with non-party Randall Stephenson ("Stephenson") (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of twelve Directors that were on the Board at the time of the filing of this complaint.

264.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while one of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $23.8 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

265.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, one of the Director-Defendants sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

266.    Additional reasons that demand on Defendant McMillon is futile follow. Defendant McMillon has served as the Company's CEO since 2014 and as a Company director since 2013. He is Chair of the Executive Committee. He was worked at the Company for almost thirty years including in various executive roles. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant McMillon with his principal occupation for which he receives handsome compensation as detailed above. As CEO, Defendant McMillon was ultimately responsible for the many false and misleading statements and omissions that were made, including those contained in the 2016 10-K, the 2017 10-K, the 2018 10-K, the 2019 10-K, and the 2020 10-K, each of which he personally signed and signed SOX certifications for, and the 2020 Proxy Statement, which was solicited on his behalf. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant McMillon is a defendant in the Securities Class Action. For these reasons, Defendant McMillon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

267.    Additional reasons that demand on Defendant Conde is futile follow. Defendant Conde has served as a Company director since February 2019. He also serves as a member of both the Audit Committee and the Technology and eCommerce Committee. Defendant Conde has received and continues to receive substantial compensation for his role as a director as described above. As a trusted Company director, Defendant Conde conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded

his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Conde signed, and thus personally made the false and misleading statements in the 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant Conde breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

268.    Additional reasons that demand on Defendant Flynn is futile follow. Defendant Flynn has served as a Company director since 2012. He also serves as Chair of the Audit Committee and as a member of the Company's Technology and eCommerce Committee. Defendant Flynn has received and continues to receive substantial compensation for his role as a director as described above. As a trusted Company director, Defendant Flynn conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Flynn signed, and thus personally made the false and misleading statements in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant Flynn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

269.    Additional reasons that demand on Defendant Friar is futile follow. Defendant Friar has served as a Company director since February 2018. She also serves as the Chair of the Strategic Planning and Finance Committee and a member of the Audit Committee. Defendant Friar has received and continues to receive significant compensation for her role as a director as described

above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Friar signed, and thus personally made the false and misleading statements in the 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on her behalf. For these reasons, Defendant Friar breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

270.   Additional reasons that demand on Defendant Harris is futile follow. Defendant Harris has served as a Company director since 2017. She also serves as a member of the Compensation and Management Development Committee, the Nominating and Governance Committee, and the Strategic Planning and Finance Committee. Defendant Harris has received and continues to receive significant compensation for her role as a director as described above. As a trusted Company director, Defendant Harris conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Harris signed, and thus personally made the false and misleading statements in 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on her behalf. For these reasons, Defendant Harris breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

271.    Additional reasons that demand on Defendant Horton is futile follow. Defendant Horton has served as a Company director since 2014. He also serves as Lead Independent Director and serves as Chair of the Nominating and Governance Committee and as a member of the Audit Committee, the Executive Committee, and the Strategic Planning and Finance Committee. Defendant Horton has received and continues to receive substantial compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Horton signed, and thus personally made the false and misleading statements in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant Horton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

272.    Additional reasons that demand on Defendant Mayer is futile follow. Defendant Mayer has served as a Company director since 2012. She also serves as a member on both the Compensation and Management Development Committee and the Technology and eCommerce Committee. Defendant Mayer has received and continues to receive significant compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Mayer signed, and thus personally made the false and misleading statements in the 2016

10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on her behalf. For these reasons, Defendant Mayer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

273.    Additional reasons that demand on Defendant Penner is futile follow. Defendant Penner has served as Company director since 2008 and as Chairman of the Board since 2015. He also serves as a member of the Executive Committee. Moreover, he has worked at the Company in various capacities since 2001 and is the son-in-law of Defendant R. Walton. Thus, as the Company admits, he is a non-independent director. Defendant Penner has received and continues to receive substantial compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Penner signed, and thus personally made the false and misleading statements in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant Penner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

274.    Additional reasons that demand on Defendant Reinemund is futile follow. Defendant Reinemund has served as a Company director since 2010. He also serves as Chair of the Compensation and Management Development Committee and as a member on both the Nominating and Governance Committee and the Technology and eCommerce Committee.

Defendant Reinemund has received and continues to receive substantial compensation for his role as a director as described above. As a trusted Company director, Defendant Reinemund conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Reinemund signed, and thus personally made the false and misleading statements in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant Reinemund breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

275.    Additional reasons that demand on Defendant R. Walton is futile follow. Defendant R. Walton has served as Company director since 1978. He also serves as a member of the Executive Committee and the Strategic Planning and Finance Committee. Moreover, he has worked at the Company in various capacities since 1968, including as Chairman of the Board from 1992 to 2015. In addition, he is the uncle of Defendant S. Walton and the father-in-law of Defendant Penner. He is also a controlling shareholder, with beneficial ownership of 50.21% of the Company's outstanding stock. Thus, as the Company admits, he is a non-independent director. Defendant R. Walton has received and continues to receive substantial compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which

yielded over $995 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant R. Walton signed, and thus personally made the false and misleading statements in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant R. Walton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

276.    Additional reasons that demand on Defendant S. Walton is futile follow. Defendant S. Walton has served as Company director since 2016. He also serves as Chair of the Technology and eCommerce Committee. Moreover, he is the nephew of Defendant R. Walton. Thus, as the Company admits, he is a non-independent director. Defendant S. Walton has received and continues to receive substantial compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant S. Walton signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant S. Walton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

277.    Additional reasons that demand on the Board is futile follow.

278.    Each of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

279.    As described above, one of the Director-Defendants directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant R. Walton received proceeds of over $995 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and excused.

280.    As the Director-Defendants have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, three of the Director-Defendants—Defendants Penner, R. Walton, and S. Walton—have close familial relationships with each other. In addition, Defendant S. Walton and McMillon serve together on the board of the Crystal Bridges Museum of American Art. Moreover, Defendants Conde, Flynn, and Mayer are all affiliated in various capacities with the World Economic Forum. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

281.     Defendants Conde, Flynn, Friar, and Horton (the "Audit Committee Defendants") serve as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's accounting and financial reporting process, the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable legal and regulatory requirements. The Audit Committee Defendants failed to fulfill these obligations, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

282.     In violation of the Code of Conduct and the Company's own corporate governance, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of Sections 14(a) of the Exchange Act, and the claims alleged in the Securities Class Action. In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

283.     Walmart has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Walmart any part of the damages Walmart suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

284.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

285.    The acts complained of herein constitute violations of fiduciary duties owed by Walmart's controlling shareholders, officers, and directors, and these acts are incapable of ratification.

286.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Walmart.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of Walmart, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if

such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

287.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Walmart to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

288.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Director-Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

289.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

290.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

291.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

292.    Under the direction and watch of the Director-Defendants, the 2020 Proxy Statement failed to disclose that: (1) the Company was filling prescriptions from physicians known to be over-prescribers, also called "pill mills;" (2) the Company filled prescriptions numbering in the thousands which had clear signs of illegality, including prescriptions of drugs which were extremely dangerous when used together; (3) Walmart's managers actively encouraged Walmart's pharmacists to abdicate their legal responsibilities and to fill as many prescription drug orders as they could, regardless of their validity; (4) Walmart's pharmacy revenue was artificially inflated because of the amount of prescriptions they were illegally filling; (5) Walmart did not maintain an adequate suspicious order monitoring program; (6) due to this, Walmart's distribution network failed to detect and report thousands of suspicious orders; (7) by illegally filling prescriptions and shipping suspicious orders in such great quantities, the Company was likely to, and did, become subject to enforcement action; and (8) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

293.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors, advisory approval of executive compensation, and ratification of the Company's independent auditor.

294.     The false and misleading elements of the 2020 Proxy Statement led to, *inter alia*, the re-election of Defendants Conde, Flynn, Friar, Harris, Horton, Mayer, McMillon, Penner, Reinemund, R. Walton, and S. Walton, which allowed them to continue breaching their fiduciary duties to Walmart.

295.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

296.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

297.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Walmart's business and affairs.

298.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

299.     In breach of their fiduciary duties owed to Walmart, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company was filling prescriptions from physicians known to be over-prescribers, also called "pill mills;" (2) the Company filled prescriptions numbering in the thousands which had clear signs of illegality, including prescriptions of drugs which were extremely dangerous when used together; (3) Walmart's managers actively encouraged Walmart's pharmacists to abdicate their legal responsibilities and to fill as many prescription drug orders as they could, regardless of their validity; (4) Walmart's pharmacy revenue was artificially inflated because of the amount of prescriptions they were illegally filling; (5) Walmart did not maintain an adequate suspicious order

monitoring program; (6) due to this, Walmart's distribution network failed to detect and report thousands of suspicious orders; (7) by illegally filling prescriptions and shipping suspicious orders in such great quantities, the Company was likely to, and did, become subject to enforcement action; and (8) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

300.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact.

301.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds in excess of $995 million.

302.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Walmart's securities and disguising insider sales.

303.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

304.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Walmart has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

305.    Plaintiff on behalf of Walmart has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

306.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

307.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Walmart.

308.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Walmart that was tied to the performance or artificially inflated valuation of Walmart, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

309.    Plaintiff, as a shareholder and a representative of Walmart, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

310.    Plaintiff on behalf of Walmart has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

311.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

312.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

313.     In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

314.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

## FIFTH CLAIM

### Against Defendants McMillon and Biggs for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

315.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

316.     Walmart, along with Defendants McMillon and Biggs are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants McMillon and Biggs's willful and/or reckless violations of their obligations as officers and/or directors of Walmart.

317.    Defendants McMillon and Biggs, because of their positions of control and authority as officers and/or directors of Walmart, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Walmart, including the wrongful acts complained of herein and in the Securities Class Action.

318.    Accordingly, Defendants McMillon and Biggs are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

319.    As such, Walmart is entitled to receive all appropriate contribution or indemnification from Defendants McMillon and Biggs.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Walmart, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Walmart;

(c)    Determining and awarding to Walmart the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Walmart and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Walmart and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following

resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
>
> 2. a provision to permit the shareholders of Walmart to nominate at least six candidates for election to the board; and
>
> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Walmart restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Dated: April 16, 2021                      Respectfully submitted,

**deLeeuw Law LLC**

**/s/** *P. Bradford deLeeuw*
P. Bradford deLeeuw
1301 Walnut Green Road
Wilmington, DE 19807
Telephone: (302) 274-2180
Facsimile: (302) 351-6905
Email: brad@deleeuwlaw.com

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown

240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net